## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **WHEREHOUSE ENTERTAINMENT, INC.,** | ) | |
| **a Delaware Corporation, et al.[1],** | ) | **Case No. 03-10224** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |

## DECLARATION OF MEHDI MAHDAVI IN SUPPORT OF
## FIRST-DAY MOTIONS AND APPLICATIONS

I, Mehdi Mahdavi, hereby declare:

1.    I am Vice President of Finance and Controller of Wherehouse

Entertainment, Inc., a Delaware corporation ("WEI"), parent corporation to WEI's direct and

indirect wholly-owned subsidiaries Wherehouse Holding I Co., Inc., a Delaware Corporation

("WEI Holding I"), Wherehouse Holding II Co., Inc., a Delaware corporation ("WEI Holding

II"), Wherehouse Subsidiary I Co., Inc., a Delaware corporation ("WEI Subsidiary I"),

Wherehouse Subsidiary II Co., Inc., a California corporation ("WEI Subsidiary II"), Wherehouse

Subsidiary III Co., Inc., a Delaware Corporation ("WEI Subsidiary III"), and Wherehouse.com,

Inc., a California corporation ("Wherehouse.com"), each as a debtor and debtor in possession.

WEI Holding I, WEI Holding II, WEI Subsidiary I, WEI Subsidiary II, and WEI Subsidiary III

are collectively referred to herein as the "Wherehouse Subsidiaries." WEI, Wherehouse.com and

the Wherehouse Subsidiaries are collectively referred to herein as the "Debtors." My duties for

the Debtors include responsibility for overseeing the daily financial operations of the Debtors

and supervising the maintenance of books and records. I am familiar with the day to day

operations, business affairs and books and records of the Debtors.

---

[1] The Debtors are the following entities: Wherehouse Entertainment, Inc., Wherehouse Holding I Co., Inc., Wherehouse Holding II Co., Inc., Wherehouse Subsidiary I Co., Inc., Wherehouse Subsidiary II Co., Inc., Wherehouse Subsidiary III Co., Inc. and Wherehouse.com, Inc.

2.     I submit this Declaration in connection with the voluntary Chapter 11 petitions and first-day motions of the Debtors in the above-captioned Chapter 11 cases. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first-day motion or application. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon information supplied to me by counsel to the Debtors, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the Debtors' operations, financial condition and related business issues. If I were called upon to testify, I could and would testify competently to the facts set forth herein, and am authorized to submit this Declaration on behalf of the Debtors.

3.     Part I of this Declaration describes the businesses of the Debtors and the relevant background preceding the filing of their Chapter 11 petitions. Part II of this Declaration sets forth the relevant facts in support of each first-day motion and application filed by the Debtors concurrently herewith.

### Background

4.     The Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on January 21, 2003 (the "Petition Date"). A motion for joint administration of the Debtors' bankruptcy cases pursuant to Federal Rule of Bankruptcy Procedure 1015(b) is pending before the Court. Pursuant to Bankruptcy Code Sections 1107(a) and 1108, the Debtors are operating their business and managing their affairs as debtors and debtors in possession. As of the date hereof, no trustee, examiner or committee has been appointed in any of these Chapter 11 cases.

5. WEI is a retailer of prerecorded music and other entertainment products. WEI's stores generally sell a broad array of entertainment products. WEI sells prerecorded music, videocassettes, DVDs, video games, personal electronics (including without limitation personal stereos, portable stereos, headphones and related merchandise), blank audiocassettes and videocassettes and accessories. WEI's total revenue for its most recent fiscal year, ended January 31, 2002, was $599.9 million. Of that, the percentage contributed by merchandise sales was 99.3%. WEI's other revenue source is the rental of prerecorded videocassettes, DVDs and other products.

6. WEI is one of the largest retailers of prerecorded music and related media and electronics in the United States, both in terms of revenues and store locations. As of the Petition Date, WEI operated approximately 370 stores in 23 states (collectively, the "Wherehouse Stores"). All but 13 of WEI's stores operate under the names "The Wherehouse," "Wherehouse Music," or "Wherehouse Entertainment." The remaining stores operate under the names "Tu Musica," "Xchange," "Wherehouse Outlet" or "Odyssey." The Debtors also maintain executive offices in Torrance, California and a distribution center in Carson, California. The premises for WEI's stores, executive offices and distribution center are leased with the exception of one store that is owned by WEI.

7. WEI's predecessor ("Old Wherehouse")[2] was formed in 1970. On August 2, 1995, Old Wherehouse and its parent company, WEI Holdings, Inc., a Delaware corporation ("Old Wherehouse Holdings"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware. During the following

---

[2] Until January 1997, Old Wherehouse was known as Wherehouse Entertainment, Inc. In connection with consummation of its Chapter 11 plan of reorganization, Old Wherehouse changed its name to Wherehouse Dissolution Co. and sold substantially all its assets to WEI.

approximately 1½ years, they restructured their business operations and developed a plan of reorganization. That plan of reorganization (the "Old Wherehouse Plan") was confirmed by an order of the United States Bankruptcy Court for the District of Delaware entered on January 7, 1997. The Old Wherehouse Plan entailed the conversion of essentially all Old Wherehouse's institutional debt into equity in WEI.

8.     WEI was formed as a Delaware corporation on November 15, 1996. On January 31, 1997, WEI acquired substantially all the assets of Old Wherehouse and Old Wherehouse Holdings pursuant to the Old Wherehouse Plan.

9.     WEI acquired the Wherehouse Subsidiaries on October 26, 1998 in connection with a stock purchase from Viacom International, Inc. ("Viacom"). As a result, WEI owns all of the capital stock of WEI Holding I and WEI Holding II. WEI Holding I in turn owns all of the capital stock of WEI Subsidiary I and WEI Subsidiary III as its sole significant assets. WEI Holding II in turn owns all of the capital stock of WEI Subsidiary II as its sole significant asset.

10.     Prior to WEI's purchase of these companies in 1998, they had been operating music retail stores under the name "Blockbuster Music." Subsequent to the acquisition, WEI has conducted all operations at all of these stores under the "Wherehouse Music" name, and the Wherehouse Subsidiaries have been engaged only in holding the leaseholds for the former Blockbuster Music stores. Thus, WEI is the main operating company, employs essentially all the Debtors' employees, and owns all the inventory sold or rented in the stores. The Wherehouse Subsidiaries are real estate holding companies acting as the tenant under the leases for the former Blockbuster Music stores.

11.     WEI currently employs approximately 5,300 employees. Approximately 1,600 of these employees are full-time employees, and approximately 3,700 are part-time employees or temporary employees. However, WEI's labor requirements vary based on seasonal business fluctuations, and a large number of additional store and distribution center employees may be added during the peak holiday season. WEI's corporate office staff consists of approximately 260 employees that are responsible for executive and general operational management, buying, merchandising, advertising, finance, accounting, human resources, legal, information systems and real estate management.

12.     In the first several years after confirmation of Old Wherehouse's Plan, WEI prospered. However, during the recent past, WEI has been adversely affected by an industry-wide trend adversely affecting specialty music retailers. For example, according to Nielsen SoundScan, an industry analysis group, the music industry has seen total United States album sales for calendar year 2002 diminish by approximately 11%, and CD sales, which account for about 94% of the music industry market, diminish by approximately 9%.[3] For its fiscal year ended January 31, 2002, WEI's same store sales decreased approximately 6.4% and this trend has continued during the current fiscal year. Management attributes this largely to a general weakness in new music releases, CD "burning" and piracy of music over the Internet, and mass merchandisers and electronics retail chains selling new music and DVDs at or below cost. This trend has hit particularly hard at some of WEI's least profitable stores, particularly many of the former Blockbuster Music stores. Thus, during these bankruptcy cases, the Debtors intend to reject the leases for many of their unprofitable stores. Fortunately, WEI has a core

---

[3] Source: Los Angeles Times, January 3, 2003.

group of profitable stores around which it can reorganize and the Debtors intend to pursue such a reorganization as promptly as possible.

13.     WEI started this process prior to filing bankruptcy, shutting down some of its least profitable stores. But, obviously, a company's ability to downsize unprofitable operations is greatly enhanced by filing for bankruptcy protection and that is one of the main reasons the Debtors initiated these cases.

### First-Day Motions

14.     The Debtors have requested various types of relief in "first-day" motions (collectively, the "First Day Motions") in order to minimize the adverse effects of the commencement of their Chapter 11 cases on their business. I believe that a critical and necessary element in successfully reorganizing the Debtors is the approval of the Debtors' First Day Motions submitted concurrently herewith. The factual background and support of each First Day Motion is set forth below.

### A.     Motion for Order Authorizing Joint Administration of the Debtors' Cases

15.     The seven companies that comprise the Debtors are related entities. WEI owns all of the capital stock of its subsidiaries Wherehouse.com, WEI Holding I and WEI Holding II. WEI Holding I in turn owns all of the capital stock of its subsidiaries WEI Subsidiary I and WEI Subsidiary III and WEI Holding II in turn owns all of the capital stock of its subsidiary WEI Subsidiary II. Accordingly, Wherehouse.com, WEI Holding I, WEI Holding II, WEI Subsidiary I, WEI Subsidiary II, and WEI Subsidiary III are wholly-owned direct and indirect subsidiaries of WEI. I am informed by counsel that, as a result, the Debtors are affiliates within the meaning of Bankruptcy Code Section 101(2), and that joint administration of their estates is appropriate under Federal Rule of Bankruptcy Procedure 1015(b).

16.     I am informed by counsel that the joint administration of the Debtors' cases will facilitate and promote an economically efficient administration of these cases, permit the Clerk of the Court to utilize a single general docket for these cases, and combine notices to creditors of the Debtors' respective estates and other parties in interest which will result in savings to the estates.

17.     I am further informed by counsel that, if joint administration is ordered, the Debtors, the Court and creditors and other parties in interest will be able to avoid incurring considerable unnecessary time and expense in connection with, among other things, the need to file duplicative motions, enter duplicative orders, and forward duplicative notices to creditors and other parties in interest.

18.     The Debtors also anticipate that they will file a joint plan of reorganization and a joint disclosure statement. I am informed by counsel that joint administration will further enable parties in interest in these Chapter 11 cases to be aware of the various matters before the Court in all of the Debtors' cases.

19.     Consequently, I believe and submit that the joint administration of these Chapter 11 cases is in the best interest of the Debtors, the Debtors' estates, their creditors and other parties in interest.

**B.      Motion for Order Granting Extension of Time for Filing Schedules and Statements**

20.     By this motion, the Debtors seek entry of an order extending the time for the Debtors to file their schedules of assets and liabilities, a schedule of current income and expenditures, a schedule of executory contracts and unexpired leases and a statement of financial affairs (collectively, the "Schedules and Statements"). The Debtors are large and complex

enterprises with operations throughout North America. Because of (a) the substantial size and scope of the Debtors' businesses, (b) the complexity of their financial affairs, (c) the limited staffing available to perform the required internal review of their accounts and affairs and (d) the press of business incident to the commencement of these Chapter 11 cases, the Debtors were unable to assemble, prior to the Petition Date, all of the information necessary to complete and file the Schedules and Statements.

      21.     Given the urgency with which the Debtors sought Chapter 11 relief and the more critical and weighty matters that the Debtors' limited staff of accounting and legal personnel must address in the early days of these cases, the Debtors will not be in a position to complete the Schedules and Statements within 30 days of the Petition Date.

      22.     Completing the Schedules and Statements for each of the seven Debtors will require the collection, review and assembly of information from multiple locations throughout the United States. For example, the Debtors are parties to hundreds of non-residential real property leases and executory contracts. These leases and contracts need to be effectively catalogued, scheduled and analyzed, and it will take substantial time and effort by the Debtors to accurately review and summarize the leases and contracts to satisfy the requirements of the Debtors in producing the Schedules and Statements. Nevertheless, recognizing the importance of the Schedules and Statements in these Chapter 11 cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances. The administrative staff at the Debtors' corporate headquarters have commenced diligent efforts to compile and analyze the information necessary to complete the Debtors' Schedules and Statements.

23.     The substantial size, scope and complexity of these cases and the volume of material that must be compiled and reviewed by the Debtors' limited staff to complete the Schedules and Statements for all of the Debtors during the hectic early days of these Chapter 11 cases justify, if not compel, the requested extension.

24.     The Debtors request that an extension not constitute a waiver of their right to request additional extensions to file their schedules.

## C.     Motion for Order (A) Authorizing the Continued Use of the Debtors' Centralized Cash Management System, (B) Authorizing Maintenance of the Debtors' Existing Bank Accounts and Business Forms, and (C) Extending the Debtors' Time to Comply With Section 345 of the Bankruptcy Code

25.     By this motion, the Debtors seek entry of an order (i) authorizing the continued use of the Debtors' existing bank accounts and business forms, (ii) authorizing maintenance of the Debtors' existing cash management system and (ii) extending the time for the Debtors to comply with the investment guidelines of Bankruptcy Code Section 345. The Debtors seek this authorization to insure their orderly entry into bankruptcy and to help efficiently administer their business and avoid the disruptions and distractions that would inevitably divert the Debtors' attention from urgent matters during the initial stages of their bankruptcy cases.

### a.     The Cash Management System

26.     As noted above, the Debtors operate Wherehouse Stores in different geographical locations across the country. The employees working at the different Wherehouse Stores and the customers purchasing goods from the Wherehouse Stores generally reside in the same geographic locations as the Wherehouse Stores.

27.     The Debtors currently maintain a number of bank accounts in the ordinary course of business at different geographic locations to facilitate the Debtors' nationally located Wherehouse Stores, and utilize a cash concentration service with Bank of America and have certain other types of accounts with Bank of America, Mellon Bank, American Savings Bank, AmSouth Bank, Bank One NBD, Bank One, Commerce Bank, First Chicago Bank, First Union Bank, Hibernia National Bank, Key Bank of Utah, Wells Fargo/Norwest Bank, Southwest National Bank and US Bank (collectively, the "Bank Accounts"). A true and correct list of the Bank Account names and account numbers is attached to the above referenced motion as Exhibit A. The Bank Accounts include without limitation depository, concentration, operating, payroll and control distribution accounts. Although the Bank Accounts are at different geographic locations, they are fully integrated into the Debtors' centralized cash management system that is utilized in the operation of their business.

28.     The cash management system and accounts payable functions are controlled and operated by WEI, which controls and operates the cash management system for itself and all of the other Debtors. WEI requests authority to continue to operate the cash management system on behalf of all of the Debtors because the individual Debtors lack the ability and mechanisms to process received funds and make appropriate disbursements outside of the current cash management system.

29.     As part of the Debtors' centralized cash management system, all funds received at individual Wherehouse Stores are eventually transmitted to a single concentration account at Bank of America. For Wherehouse Stores that bank with Bank of America, the daily cash receipts are initially deposited in a single depository account at Bank of America and then transmitted to the concentration account. For Wherehouse Stores that do not bank with Bank of

America, the daily cash receipts are initially deposited in various regional bank depository accounts and then transmitted to the concentration account at Bank of America within two business days. In sum, the cash received into the various depository accounts are swept and deposited into the Debtors' concentration account, and the funds deposited in the various depository accounts are not transferred outside of the Debtors' cash management system by check, wire transfer or otherwise.

30.    After the funds are deposited in the concentration account, they are subsequently transmitted to an operating account at Bank of America. The operating account is utilized to directly pay the Debtors' operating expenses by wire transfer or to transfer funds to a control distribution account at Mellon Bank that is used by the Debtors to issue checks to pay their purchases and operating expenses. The operating account is also utilized to fund a payroll account at Bank of America for the payment of employee wages, benefits and related costs and expenses for all of the Debtors.

31.    The Debtors' cash management system relies upon the depository accounts, the operating account and the concentration account in order to properly operate. The Debtors could not prior to the Petition Date – and cannot efficiently now – direct all of the Debtors and the Wherehouse Stores to deposit funds directly into new depository accounts. Moreover, the Debtors' accounting systems permit a historical review of funds entering and exiting the depository accounts, the operating account and the concentration account, including which of the Debtors and Wherehouse Stores deposited such funds into a given account and which entities receive payment from the operating account. In consideration of the importance of the depository accounts, the operating account and the concentration account to the Debtors' continued operations in the ordinary course of business, the Debtors' capacity to track funds

RLF1-2556644-1

entering and exiting the accounts, and the fact that the depository accounts and the concentration account cannot be used to transfer funds outside of the Debtors' existing cash management system, the Debtors request authority to maintain and continue using the depository accounts, the operating account and the concentration account as they did prior to the Petition Date in the ordinary course of business.

32. To protect the Debtors' estates from the possible negotiation of prepetition checks against the control distribution account, the Debtors closed the control distribution account with Mellon Bank on the Petition Date. The Debtors will establish a new control distribution account at Mellon Bank (the "New Control Distribution Account") after the Petition Date to maintain the benefits of the Debtors' prepetition cash management system. The New Control Distribution Account has a purpose and function that is identical to the previous control distribution account except that the Debtors will not have written any checks or made other transfers from the New Control Distribution Account prior to the Petition Date.

33. The Debtors' cash management system will also rely upon the use of the New Control Distribution Account. The Debtors will have acted to ensure that no prepetition checks or other fund transfers will be negotiated against the Debtors' accounts after the Petition Date by opening the New Control Distribution Account and closing the previous control distribution account after the Petition Date. Further, the Debtors' accounting system allows for a historical review of funds entering and exiting the New Control Distribution Account, including specifically which individual Debtor's creditors receive funds from the New Control Distribution Account. Considering the importance of the New Control Distribution Account to the Debtors' continued operations in the ordinary course of business and the Debtors' ability to track funds entering and exiting the New Control Distribution Account, the Debtors request authority to open

and use the New Control Distribution Account in the same manner as the Debtors used the previous control distribution account prior to the Petition Date in the ordinary course of business.

34.　　As noted above, the Debtors also maintain a payroll account for payment of employee wages, benefits and related costs and expenses for all of the Debtors. The payroll account receives funds from the operating account as necessary to cover payroll related payments made therefrom and is a zero balance account. The payroll account has some outstanding checks as of the Petition Date, and the aggregate amount of such outstanding checks is approximately $300,000. To the extent that payments to be made from the payroll account were outstanding as of the Petition Date, such payments are the subject of the "Motion of the Debtors and Debtors in Possession for an Order Authorizing the Debtors to Pay Prepetition Wages, Compensation and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code" (the "Employee Motion") filed concurrently herewith. If the Court grants the relief requested in the Employee Motion, the Debtors will not need to protect the estates from the negotiation of the checks and transfers outstanding from the payroll account. However, if the Court does not approve the Employee Motion, the Debtors will immediately act to close the payroll account.

35.　　The Debtors' cash management reporting and accounting functions are systematic and include the necessary accounting controls to enable the Debtors to trace funds through the system. The Debtors maintain necessary records for their cash management system that identify the current balance of all accounts in the cash management system. These records detail the various fund transfers and intercompany indebtedness between WEI and each of the Debtors. The Debtors will continue to maintain records for transfers between the Bank Accounts so that all transactions are recorded after they occur. The Debtors will also be able to determine

the amount of funds deposited into or withdrawn from each Bank Account by the Debtors and they will track the expenses that are satisfied.

36.     The Debtors' cash management system constitutes an ordinary course and essential business practice that is similar to those utilized by other companies. The system provides significant benefits to the Debtors, and facilitates the availability of funds when necessary and reduces the costs of borrowing. It is essential for the Debtors to continue using the existing cash management system during their Chapter 11 cases on the same basis as prior to the Petition Date, and any disruption to the Debtors' ordinary business affairs at this time could have a severe adverse impact on the ability of the Debtors' to fund their cases and reorganize. Consequently, maintenance of the existing cash management system is in the best interests of the Debtors' estates, their creditors and parties in interest.

### b.     Existing Checks and Business Forms

37.     Similarly, the Debtors seek a waiver of the requirement that new bank accounts be opened to replace all of the Debtors' existing Bank Accounts because such a requirement would unnecessarily disrupt the Debtors' business, impair their efforts to successfully reorganize and not provide any significant benefit to the Debtors' estates, their creditors and parties in interest. For example, the Debtors' employees would suffer significant hardship if the Debtors were required to substitute new debtor in possession payroll accounts for the existing payroll account and face attendant delays, confusion and disruption that would necessarily result. It is critical to the continued operation of the Debtors' business and the preservation of the value of their assets that the existing cash management system and Bank Accounts continue to be utilized without disruption.

38.     In addition, the filing of the Debtors' bankruptcy petitions will undoubtedly be publicized and place a strain on the Debtors' relationships with their customers, vendors and other creditors that are essential to their continued operations. If the Debtors are required to substitute new debtor in possession bank accounts for their existing Bank Accounts, these relationships will be further strained by the payment delays and confusion that would result from opening the new accounts. Consequently, the Debtors believe that it is imperative that they be permitted to continue using the existing Bank Accounts to avoid such unnecessary disruption of their business, efficiently administer their bankruptcy cases and devote their efforts to a successful reorganization. As noted above, unless authorized by a separate order of the Court, checks issued from the payroll account prior to the Petition Date will not be honored.[4] Further, the Debtors will have closed their previous control distribution account at Mellon Bank in order to ensure that no check, draft or other form of demand or payment made prior to the Petition Date that has not yet cleared will be allowed to clear such account.

39.     In the ordinary course of its business, the Debtors use many pre-printed correspondence and business forms. The nature and scope of the Debtors' business and the numerous suppliers of goods and services require that the Debtors be permitted to continue using their existing pre-printed correspondence and business forms without alteration or modification. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations. Parties doing business with the Debtors undoubtedly will be aware, as a result of the size of these cases and the integrated nature of the industry in which the Debtors operate, of the Debtors' status as debtors

---

[4] The Debtors have filed a motion contemporaneously herewith seeking authority to pay certain prepetition obligations to employees.

LA3:1029395 3

RLF1-2556644-1

in possession. Further, opening new debtor in possession accounts would be a significant burden due to the number of accounts that the Debtors maintain. Accordingly, the Debtors also request authority to use their respective correspondence and business forms without placing the label "debtor in possession" on each such correspondence or form.

### c.     **Investment Policy**

40.     Prior to the Petition Date, the Debtors maintained a conservative investment policy that provided secure guidelines for investing any of their excess cash by limiting such investment to instruments of high credit and investment quality where the principal amounts were not at risk due to market fluctuations. The Debtors invested any excess cash ("Investable Funds") by depositing it in short term or "overnight" certificates of deposit at Merrill Lynch, a very conservative method for investing excess cash that has primary and secondary goals of protecting principal and maximizing yield and liquidity.

41.     Requiring the Debtors to change their deposit and other procedures could result in irreparable harm to the Debtors' business operations because it would disrupt their cash management system. However, the Debtors' estates and their creditors will not be harmed by the maintenance of the current deposit and other procedures because of their relative safety and the prudent deposit guidelines that the Debtors already utilize. Moreover, the yield on investments under the Debtors' prepetition policies will be greater than if the Debtors were restricted to direct investment solely in government securities, and could result in greater returns for the Debtors' estates over time with little or no additional investment risk. While the Debtors' prepetition investment policies did not require a corporate surety for investments, they did limit investments to securities or other assets with a financially strong entity.

42.     I am informed by counsel that Bankruptcy Code Section 345(a) authorizes deposits or investments of money of bankruptcy estates such as the Debtors' cash in a manner that will yield the maximum reasonable net return on such funds after taking into account the safety of each deposit or investment. I am also informed by counsel that, where deposits or investments are not insured or guaranteed by the United States or backed by the full faith and credit of the United States, Bankruptcy Code Section 345(b) provides that unless the court orders for cause otherwise the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety.

43.     I am further informed by counsel that Bankruptcy Code Section 345(b) expressly provides that the Court may modify these requirements for cause. The Debtors submit that, under the circumstances present in their cases, adequate cause exists to authorize the Debtors to continue to invest excess cash in substantially the same manner as the Debtors have invested such funds prior to the Petition Date and to maintain their prepetition investment policies.

44.     Here, the Debtors are sophisticated investors that prudently manage their funds. Allowing the Debtors to continue the investment of Investable Funds in accordance with their prepetition practices is within the protections sought to be advanced by the general guidelines set forth in Bankruptcy Code Section 345(b), and will avoid the disruption of business operations and the cash management system. Accordingly, the Debtors respectfully request a thirty (30) day extension within which to come in compliance with Bankruptcy Code Section 345. If the Debtors determine that they are unable to comply with the requirement of

Bankruptcy Code Section 345 within that thirty (30) day period, the Debtors will file a motion seeking authority to deviate from such requirements.

**D.** **Motion for Order (A) Authorizing and Approving the Rejection of Certain Unexpired Leases of Nonresidential Real Property; (B) Approving an Expedited Procedure for Rejection of Certain Unexpired Leases of Nonresidential Real Property; and (C) Authorizing the Debtors to Conduct Store Closing Sales or "Going Out Of Business" Sales at Certain Store Locations**

45.     By this motion, the Debtors seek entry of an order (a) authorizing the Debtors to immediately reject, retroactive to the date of the above referenced motion, certain unexpired leases of nonresidential real property listed on Exhibit A attached to the above referenced motion; (b) approving an expedited procedure whereby rejection of the leases identified on Exhibit B attached to the above referenced motion would become effective ten days following the date on which the Debtors provide written notice of rejection to the affected landlords; and (c) authorizing the Debtors, on their own or through a consultant, to conduct store closing sales ("Store Closing Sales") and/or "going-out-of-business" sales ("GOB sales") at the Debtors' store locations identified on Exhibit B attached to the above referenced motion (the "Closing Stores") without the necessity of complying with any applicable state or local statutes, rules or ordinances, and notwithstanding contrary provisions in any of the affected leases.

46.     The Debtors are party to the 31 nonresidential real property leases set forth on Exhibit A attached to the above referenced motion (the "Exhibit A Leases") and the 186 nonresidential real property leases set forth on Exhibit B attached to the above referenced motion (the "Exhibit B Leases"). The Exhibit A Leases and the Exhibit B Leases are referred to collectively herein as the "Leases."

47.    Prior to the Petition Date, the Debtors engaged in a comprehensive review of all their real property lease obligations, and determined that the Leases were of no value to the Debtors. The retail stores at the premises encompassed by the Leases are among the Debtors' worst-performing and most unprofitable stores. To reduce their losses from those stores, the Debtors already have ceased possession of the properties that are the subject of the Exhibit A Leases. Moreover, many of the properties subject to the Exhibit B Leases have been subleased to non-debtor third parties, such that the Debtors have ceased possession of those leased premises as well.

48.    The Debtors have further determined that, based on current market conditions, it would be difficult if not impossible for the Debtors to recruit tenants to sublease the spaces, even if they were offered to prospective tenants at substantially lower rental rates than those currently due under the Leases. Accordingly, the Debtors have concluded that no possible benefit can be obtained from retaining the Leases and that it is in their best interests and the best interests of the estates and creditors to reject the Leases on the schedules requested herein.

49.    In the absence of rejection on the schedules requested herein, the Leases will cause the estates to incur substantial amounts of rent and other charges and result in significant expenses with no commensurate benefit to the Debtors, their estates or their creditors. The aggregate monthly rent due under the Exhibit A Leases is in excess of $503,781. The aggregate monthly rent due under the Exhibit B Leases is in excess of $1,523,449.

50.    The Debtors have also determined that rejection of the Leases would result in a net benefit to the Debtors, the estates and creditors. After a review of the economic terms of the Leases and the general economic conditions prevailing in the markets where the real estate is

located, it is clear that subletting the Leases is not a viable option, even at substantially lower rental rates, and that no possible benefit can be obtained from retaining the Leases.[5] Rejection of the Leases will allow the estates to avoid incurring large amounts of rent and other charges that would result in significant administrative expenses payable by the estate, an amount estimated to be in excess of $2,027,000 per month. Finally, rejection of the Leases will allow the Debtors to focus their attention, resources, and efforts on their reorganization and will greatly simplify business operations.

51. Prior to the Petition Date, the Debtors also extensively reviewed the performance of their retail store locations, including a review of the profitability of each store on a stand-alone basis. As a result of this review process, the Debtors identified the Closing Stores as underperforming and/or unprofitable stores that should be closed as part of the Debtors' overall business strategy. The Debtors further determined that conducting Store Closing Sales and/or GOB Sales at the Closing Stores prior to their closing would provide the best opportunity for maximizing the value of the inventory located within those stores. The Debtors believe that any attempt to restore the profitability of the Closing Stores would not only be futile, but perhaps more significantly, would distract management from critical efforts to restructure the Debtors' ongoing operations. The Debtors are in the process of engaging a consultant to assist in conducting the Store Closing Sales and GOB Sales,[6] but seek authority to begin such sales immediately using store employees. Such authority is needed in order to liquidate the inventory, fixtures and equipment at each of the affected properties.

---

[5] Approximately forty of the Exhibit B Leases have already been subleased to non-debtor parties.
[6] The Debtors will seek separate approval from the Court for engagement of a consultant.

**E. Motion for Order Authorizing the Debtors to Pay Prepetition Sales, Use and Franchise Taxes Pursuant to Section 105(a) of the Bankruptcy Code**

52. By this motion, the Debtors seek entry of an order that authorizes, but does not direct, the Debtors to pay undisputed prepetition sales, use and franchise tax obligations owed to the appropriate taxing authorities (the "Taxing Authorities") in the ordinary course of business, on an unaccelerated basis, as payments become due and payable and to the extent adequate funds are available to make such payments. To the extent that a check used prior to the Petition Date had not cleared the bank as of the Petition Date, the Debtors also seek entry of an order (i) authorizing the Debtors' banks to honor such checks and/or any prepetition wire transfer requests and (ii) authorizing the Debtors to issue replacement checks, submit replacement fund transfer requests or provide other means of payment to the Taxing Authorities to the extent necessary to pay all undisputed prepetition sales, use and franchise tax obligations.

53. In connection with the normal operation of their business, the Debtors incur franchise and other taxes and fees and collect sales and use taxes from their customers and other third parties (collectively, the "Taxes") on behalf of various taxing authorities for payment to such authorities. The Debtors pay the Taxes to the various Taxing Authorities on a monthly, quarterly or yearly basis depending on the particular Tax as such payments become due and payable and to the extent adequate funds are available to make such payments.

54. On a periodic basis, the Debtors pay to the Taxing Authorities all sales and use taxes collected by funds drawn by check or by means of an electronic funds transfer or check. Accordingly, prior to submitting payment to the appropriate Taxing Authority for a given period, the Debtors may hold a significant balance of collected but unremitted Taxes. In

particular, the Debtors may hold a significant balance of sales taxes collected from customers that purchase merchandise from the Debtors.

55. As of the Petition Date, the Debtors' financial records indicate that the Debtors are substantially current on their payment of Taxes to all Taxing Authorities. Therefore, the Debtors seek this relief out of an abundance of caution and to the extent that any Taxes accrued prepetition were not paid prepeption, paid in an amount that is less than actually owed, or if any payments sought to be made prepetition are rejected, lost or otherwise not received in full by any Taxing Authority. The Debtors estimate that the total amount of Taxes actually due prepetition and not yet paid is approximately $1,800,000. The Debtors also estimate that the total amount of Taxes accrued and collected as of the Petition Date but not yet due is approximately $3,200,000.[7] These amounts represent a very small fraction of the Debtors' total assets.

56. The Debtors believe that the failure to pay the Taxes could have a material adverse impact on their ability to operate in the ordinary course of business. The Debtors operate Wherehouse Stores across the country and many disputes that could impair their ability to conduct business in a particular jurisdiction could effect the Debtors as a whole. Furthermore, the Debtors believe that many Taxing Authorities may cause the Debtors to be audited if certain of the Taxes are not paid, and such audits will unnecessarily divert the Debtors' attention from their business operations and reorganization. The payment of the Taxes is also necessary to avoid potential administrative difficulties. I am informed by counsel that withholding of

---

[7] Prior to the Petition Date, the Debtors' collections were swept daily by Congress Financial Corporation (Western) ("Congress") and applied to Congress's loans. Those collections that were swept by Congress may include trust fund monies for sales and use taxes that the Debtors collected on behalf of their customers. The Debtors requested Congress to return the funds for such prepetition sales and use taxes on the grounds that such funds are trust funds. To date, Congress has declined. The Debtors reserve their rights against Congress with respect to this matter.

payment of the Taxes will likely cause the Taxing Authorities to take immediate action, including an increase in state audits and lien filings or motions for relief from stay. Prompt and regular payment of the Taxes will help avoid these unnecessary government actions.

57.     I am further informed by counsel that the sales and use taxes and franchise taxes and related fees may be entitled to priority status pursuant to Bankruptcy Code Section 507(a)(8), and therefore such taxes and fees must be paid in full under any plan. Accordingly, the payment of the taxes and fees affects the timing of the payment and should not prejudice the rights of other creditors or reduce the ultimate distribution to such creditors.

F.     **Motion for Order Authorizing the Debtors to Satisfy Prepetition Claims of Certain Common Carriers and Sales and Shipping Processors Pursuant to Section 105(a) of the Bankruptcy Code**

58.     The Debtors receive goods through various forms of shipment, and much of the Debtors' pricing policies, marketing strategies and fundamental business operations rely on their ability to obtain and sell goods at competitive prices. The sale of prerecorded music, videocassettes, DVDs, video games, personal electronics (including without limitation personal stereos, portable stereos, headphones and related merchandise), blank audiocassettes and videocassettes and accessories and other items (the "Retail Merchandise") is the essence of the Debtors' business.

59.     The Debtors' ability to timely receive, distribute and return goods depends on the maintenance of a successful and efficient system of transportation, and any disruption of the delivery or return of Retail Merchandise would have an immediate and devastating impact on the Debtors' operations. Likewise, any disruption in the Debtors' ability to sell Retail Merchandise would have an equally immediate and devastating impact on the Debtors' operations. Thus, the Debtors' business operations and the success of their reorganization

depend on the maintenance of reliable and efficient transportation and sale processing systems for Retail Merchandise, and these two related and important systems involve the use of the Common Carriers and Sales and Shipping Processors.

60. The Debtors must ensure that their Chapter 11 cases do not present a reason for third parties such as the Common Carriers and Sales and Shipping Processors to cease to continue timely performing services because the Debtors are in many cases dependent on the services of such third parties. If the Debtors are unable to ship, receive sell and return deliveries of Retail Merchandise on a timely and uninterrupted basis, their operations will be immediately and substantially impeded and their business will suffer irreparable damage.

61. Prior to the Petition Date, the Debtors performed an analysis of (i) the identities of the core and indispensable Common Carriers and Sales and Shipping Processors, (ii) the Retail Merchandise that was in transit or needed to be shipped by the Common Carriers, (iii) the anticipated amount of payments that would be necessary for the Debtors to receive the Retail Merchandise in transit and (iv) the anticipated amount of payments that would be necessary for the Debtors to continue receiving the services provided by the Common Carriers and Sales and Shipping Processors.

62. The Debtors have identified a core group of Common Carriers that consists of, without limitation, Dart International, United Parcel Service, USF Reddaway, Pacific Transportation, DHE/DLS, APDS, Special Dispatch L.A., Special Distribution/Houston, Gold Coast and Pilot Air. The Debtors have determined that each of the Common Carriers is absolutely necessary to the continued shipping, delivery and return of goods used or sold in the ordinary course of the Debtors' business.

63. The Debtors have also identified a core group of Sales and Shipping Processors that consist of Omega Business Products, a supplier of unique labels specifically produced for the Debtors' inventory and equipment and used in the shipping and transport of such goods, and NDC, a credit card and check processor that provides all of the sale processing services for the Debtors' sale of Retail Merchandise. The Debtors have determined that the services of Omega Business Products and NDC are absolutely necessary to the continued shipping and sales of Retail Merchandise, and without their services the Debtors will be unable to timely ship goods or process sales of Retail Merchandise that involve credit card and check purchases, which are a substantial source of payment for all of the Debtors' retail sales.

64. The Debtors currently have Retail Merchandise valued at approximately $37.8 million being shipped to the Debtors. The total estimated amount owed to all Common Carriers and the maximum amount required to obtain or deliver the Retail Merchandise is approximately $425,000. The total estimated amount owed to all Sales and Shipping Processors for shipping and sales processing services is approximately $275,000. Further, the Debtors intend to negotiate with the Common Carriers and Sales and Shipping Processors to obtain continued services with less than full payment to such Common Carriers and Sales and Shipping Processors, although they seek Court approval for payments of amounts related to the services provided by Common Carriers and Sales and Shipping Processors.

65. The Debtors suspect that the Common Carriers may argue that they are entitled to possessory liens for transportation and storage of the goods in their possession and may refuse to deliver or release such goods before their claims have been satisfied and their liens redeemed. I am informed by counsel that, pursuant to Bankruptcy Code Section 363(e), a carrier as a bailee may be entitled to adequate protection of a valid possessory lien.

66.     In addition, the Debtors anticipate that certain of the Common Carriers will have some outstanding invoices for Retail Merchandise that was delivered to the Debtors prior to the Petition Date (the "Shipping Charges"), and that certain of the Sales and Shipping Processors will have some outstanding invoices for products and processing services related to the delivery and sale of such Retail Merchandise prior to the Petition Date (the "Sales and Shipping Processor Charges"). The Debtors believe that, if they fail to pay these Shipping Charges and Sales and Shipping Processor Charges, certain of the Common Carriers and Sales and Shipping Processors may discontinue or delay services and withhold or prevent the shipment and sale of essential Retail Merchandise.

67.     The value of the Retail Merchandise in the possession of the Common Carriers or dependent on the services of the Sales and Shipping Processors for delivery and sale, and the potential harm to the Debtors' business if the goods are not released or timely delivered or sold, is likely to exceed the amount of such Shipping Charges and Sales and Shipping Processor Charges. Indeed, as noted above, if the Debtors are unable to ship, receive, sell and return deliveries of Retail Merchandise on a timely and uninterrupted basis, their operations will be immediately and substantially impeded and their business will suffer irreparable damage. For example, if the Sales and Shipping Processors cease providing services to the Debtors, the Debtors will be unable to ship certain essential goods or sell any Retail Merchandise to customers that will purchase such merchandise with payment by credit card or check. Likewise, if the Common Carriers cease providing services to the Debtors, the Debtors will be unable to receive any new or additional Retail Merchandise to sell to customers that is the lifeblood of their business. Therefore, the Debtors believe that it is necessary and essential to their continued

business operations and their reorganization to make payments on account of certain Shipping Charges and Sales and Shipping Processor Charges.

68.     Accordingly, the Debtors seek an order authorizing them to make certain payments to the Common Carriers and Sales and Shipping Processors as the Debtors determine in their business judgment that, in order to obtain the release or final transport of any Retail Merchandise held by or needed to be shipped by such Common Carriers and to obtain the necessary services of the Sales and Shipping Processors, are necessary or appropriate. The Debtors anticipate that such payments shall not exceed in the aggregate approximately $700,000. The Debtors seek authority to make such payments in amounts and to the extent necessary to satisfy non-disputed prepetition Shipping Charges and Sales and Shipping Processor Charges, and to satisfy any possessory liens on the goods that may be held by a Common Carrier pending payment of such charges.

69.     The Debtors shall only pay Shipping Charges and Sales and Shipping Processor Charges that, in their business judgment, will benefit the estates and their creditors from making such payments that would exceed (i) the costs the estates would incur by bringing an action to compel turnover of such goods, (ii) the delays associated with such actions, (iii) the costs of the delay in shipping, receiving and selling goods and merchandise and (iv) the business expenses related to replacing such Common Carriers and Sales and Shipping Processors to the extent replacement is possible. Further, the Debtors shall use their best efforts to negotiate total payments to the Common Carriers and Sales and Shipping Processors that are less than the full amount of any prepetition obligations.

70.     In sum, the total amount to be paid to the Common Carriers and Sales and Shipping Processors would be minimal compared to the importance and necessity of the services

of the Common Carriers and Sales and Shipping Processors and the losses the Debtors may suffer if their operations are affected by a refusal to provide ongoing services. Moreover, the Debtors do not believe that there are viable timely alternatives to the Common Carriers and Sales and Shipping Processors that they have used prior to the Petition Date.

G.     **Motion for Order Pursuant to Section 105(a) of the Bankruptcy Code Authorizing the Debtors (A) to Honor Certain Prepetition Obligations to Customers and to Continue Customer Programs; and (B) to Honor Certain Other Prepetition Obligations Necessary to Maintain the Existence of Those Customer Programs**

71.     By this motion, the Debtors seek entry of an order that authorizes, but does not direct, the Debtors to honor certain programs and policies at Wherehouse Stores that the Debtors maintain in the ordinary course of business for the benefit of their customers. In addition, the Debtors seek entry of an order that authorizes, but does not direct, the Debtors to honor certain prepetition obligations to non-debtor Stored Value Systems ("SVS") for services it provided to the Debtors prepetition in the ordinary course of their business to manage and/or maintain the customer programs and policies on the Debtors' behalf.

72.     In the ordinary course of business, the Debtors maintain various programs and policies at Wherehouse Stores for the benefit of their customers. The programs and policies maintained by the Debtors include (i) returns, (ii) gift cards and (iii) trade-ins (collectively, the "Customer Programs").

73.     The Debtors' returns program (the "Returns Program") provides that customers who return unopened new merchandise or opened "used" music with a valid receipt within thirty days of purchase may obtain full value store credit or a full refund in the same form as their original payment. Customers who return unopened new merchandise without a receipt may obtain full value store credit.

74.    The Debtors' gift card program (the "Gift Card Program") provides for stored-value gift cards, which are available for purchase by customers in any denomination and are reloadable by the customer. At the present time, the gift cards do not have an expiration date. Prior to 2000, Wherehouse Stores sold paper "gift certificates" with a specified expiration date – the "paper" program has terminated but Wherehouse Stores continue to honor the certificates past their expiration date in accordance with applicable state law. Gift cards are sold at Wherehouse Stores and, on occasion, virtual gift cards have been sold through the Debtors' website, but cards purchased through the website are redeemable for online purchases only. Gift cards are also sold through special programs with other retailers, whereby (a) the Debtors sell gift cards to those retailers at a discount, and those retailers then sell the gift cards directly to their own customers, or (b) the retailers sell gift cards directly to their customers (and "load" the cards at the time of sale with the amount of value purchased by the customer) and then remit to the Debtors the cash value of the cards less a commission discount. Customers may use gift cards to purchase merchandise or obtain a cash refund for the value remaining on the card. The Gift Card Program is managed and maintained by Stored Value Systems, a third party service provider to the Debtors.

75.    The Debtors' trade-in program (the "Trade-In Program") allows customers to "purchase" one new music CD with a value of $13.99 by trading-in five used CDs, provided that the used CDs are part of the Wherehouse Stores' current music database. Customers may also purchase certain new-release titles (with a value up to $13.99) for $9.99 with trade-in of one "used" music CD, provided that the CD is part of the Wherehouse Stores' current music database. The Trade-In Program also allows customers to purchase one new DVD with a value

of $24.99 by trading in three used DVDs, provided that the used DVDs are part of the Retail Stores' current movie database.

76.     The success, viability and revitalization of the Wherehouse Stores and the Debtors' relationship with their customers are wholly dependent upon the development and maintenance of customer loyalty. The continuation of the Customer Programs and the payment of any related prepetition obligations to the Debtors' customers are essential to the Debtors' ability to maintain the loyalty of its existing customer base and to attract new customers.

77.     The Debtors' customers are the "life-blood" of their business; without their customers, the Debtors cannot survive. In order to serve the rehabilitative purposes of Chapter 11 and the reorganization of the Debtors' business, the risks of negatively and adversely affecting the Debtors' customers associated with the filing of these Chapter 11 cases must be minimized. Any curtailment of the Debtors' ability to continue to provide the same services and programs to their customers, and the resulting negative public perception, may enable the Debtors' competitors to take advantage of the Debtors' current situation and cause substantial harm to the Wherehouse Stores and the Debtors' relationship with their customers.

78.     The Debtors do not view these programs as harmful to their business in any way. First, as a result of the Returns Program and the Trade-In Program, the Debtors receive back from their customers a saleable product that can be put back into the Wherehouse Stores and sold to another customer for profit. Second, the Gift Card Program does not result in any potential harm to the Debtors because the Debtors receive money or, in certain cases, services of equivalent value, in exchange for the gift cards at the same time they are issued. Moreover, I am informed by counsel that statutes in effect in states where the Debtors' stores are located require that gift certificates, such as the gift cards issued by the Debtors, be honored by the issuer even if

the issuer in bankruptcy.[8] In light of the foregoing, the Debtors submit that entry of an order granting the relief requested herein is appropriate and, indeed, essential to the Debtors' ability to successfully maintain the operation of the Wherehouse Stores and the Debtors' business relationship with its customers

79. Prior to the Petition Date, the Debtors performed an analysis of the services provided by SVS in connection with the Gift Card Program and determined that those services are absolutely necessary to the continued viability of the Gift Card Program. The total amount owed to SVS for its prepetition management and maintenance of the Gift Card Program is estimated at $400,000. The Debtors believe that, if they fail to pay that amount, SVS will delay or discontinue its services to the Debtors.

80. In sum, the total amount to be paid to SVS is minimal compared to the importance and necessity of the services of SVS and the losses the Debtors may suffer if their Gift Card Program is affected by a refusal by SVS to provide ongoing services. The Debtors do not believe that there are viable timely alternatives to using SVS to manage and maintain the Gift Card Program on their behalf.

### H. Motion for an Order Authorizing the Debtors to Pay Prepetition Wages, Compensation and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code

81. By this motion, the Debtors seek entry of an order that (i) authorizes but does not direct the Debtors to pay Employee Obligations, Employee Deductions and Employee Expenses (as defined herein), (ii) authorizes but does not direct the Debtors to continue their practices, programs and policies in effect as of the Petition Date with respect to all Employee Obligations (including allowing employees to use time off accrued, but unused, as of the Petition

---

[8] The Debtors believe that approximately $14,740,000 in gift cards and gift certificates have been issued, but have not yet been redeemed.

Date), Employee Deductions and Employee Expenses (as defined herein) and (iii) authorizes and directs the bank at which the Debtors maintain an account from which the Debtors' payroll obligations are disbursed and all other banks or lending institutions maintaining payroll and employee benefits accounts to honor and pay all prepetition and postpetition checks issued or to be issued and fund transfers requested or to be requested, by the Debtors in respect of the Employee Obligations, Employee Deductions and Employee Expenses. The Debtors also seek authority to issue new postpetition checks or fund transfer requests with respect to prepetition obligations that may have been dishonored by the banks in respect of the Employee Obligations, Employee Deductions and Employee Expenses, if necessary.

### d. Employee Obligations In General

82. As noted above, WEI employs in the aggregate approximately 1,600 full-time employees and approximately 3,700 part-time and temporary employees at the Wherehouse Stores and other facilities across the nation. To minimize the personal hardship that these workers will suffer if prepetition obligations are not paid when due, and to maintain workers' morale at this critical time, the Debtors seek authority to pay certain prepetition claims for, among other items, wages, salaries, federal and state withholding taxes, payroll taxes, contributions to employee benefit plans, insurance premiums and related costs, retirement plans, and all other employment related benefits, which the Debtors pay or provide in the ordinary course (collectively, "Employee Obligations").

83. In addition, the Debtors request authority to pay the appropriate third parties the amounts that are deducted and withheld from employees' paychecks (the "Employee Deductions"), which are in most instances not property of the Debtors' estates, and to reimburse employees for expenses incurred by such employees prepetition in the ordinary course of

business (the "Employee Expenses"). In sum, the Debtors seek to pay or honor in their sole discretion Employee Obligations, Employee Deductions and Employee Expenses in respect to the Debtors' current employees as of the Petition Date.

84.	Further, the Debtors seek authority for the applicable banks and other financial institutions, in accordance with the Debtors' instructions, to receive, process, honor and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors related to the Employee Obligations, Employee Deductions and Employee Expenses.

## I.	**Salaries and Wages**

### (a)	Regular Employees

85	WEI currently employs approximately 1,600 full-time employees and approximately 3,700 part-time and temporary employees as of the Petition Date (the "Employees"). As described above, the Debtors maintain Employees across the nation. These Employees provide a wide range of services to the Debtors including but not limited to sales, promotion, customer relations, technical support, distribution, clerical, finance and accounting.

86.	In the ordinary course of their businesses, the Debtors issue payroll checks on a bi-weekly basis. The Debtors last payroll checks prior to the Petition Date were issued on January 10, 2003, related to the two week pay through January 4, 2003 and was approximately six days in arrears, reflecting wages earned in the two week period up to and including the Saturday of the prior week. The next scheduled payday for Employees other than those employed at the Debtors' distribution center is January 24, 2003 and will relate to the two week pay period through January 18, 2003, and thus will include some amounts earned prior to the Petition Date. The next scheduled payday for Employees employed at the Debtors' distribution center is January 23, 2003 and will relate to the two week pay period through January 17, 2003,

and thus will also include some amounts earned prior to the Petition Date. The outstanding prepetition amounts for the payroll of the Employees as of the Petition Date is approximately $3,200,000.

87.     The Debtors seek authority to continue with their payday schedule in the ordinary course and consequently pay all Employees' prepetition compensation as well, which costs are relatively minimal compared with the size of the Debtors' estates and the damage to the Debtors' Chapter 11 Cases that would ensue if Employee morale were disrupted by the Debtor's failure to meet the payroll portion of their Employee Obligations.

(b)     Temporary Personnel

88.     The Debtors also employ approximately 150 temporary workers specializing in distribution and sales or other fields, although the number of temporary workers can fluctuate from 100 to 250 total temporary workers. These temporary workers are staffed by consultants, temporary agencies and other firms. Generally, these workers provide critical and specialized services to the Debtors. The Debtors believe that if they are unable to pay the prepetition amounts, if any, due the consultant firms and/or independent contractors, the Debtors will likely lose such services to the severe detriment of the estates.

89.     Given the varying billing periods and fluctuations in usage of temporary workers, the Debtors cannot at this point accurately estimate the accrued prepetition amounts that may be due. In the last 30 day billing cycle, however, the Debtors paid approximately $255,000 for the employment of temporary workers, and no temporary personnel will be owed more than $4,650 as of the Petition Date. Given the importance of these temporary workers to the Debtors' businesses, the Debtors seek authority to pay in their discretion any prepetition amount that may be owed in respect to such workers as part of the Debtors' Employee Obligations.

## J.    **Commissions and Bonuses**

90.    In the ordinary course of their business, the Debtors also utilize certain incentive pay programs in the form of commissions and bonuses that constitute another important element of the compensation provided to their Employees.

91.    The Debtors have several commission programs to incentivize and encourage Employee sales and management performance. Sales associate Employees that actively participate in the sale of digital product line products are eligible to receive a 2% commission on the purchase price of the product exclusive of sales tax. In addition, Sales associate Employees that actively participate in the sale of certain "spiff" products are eligible to receive up to a 5% commission on the purchase price of a product exclusive of sales tax. Store manager Employees are eligible to receive a 1% commission on the monthly sales of digital product line products on the purchase price of the product exclusive of sales tax. The commissions serve as a motivating element to the eligible Employees, and are vital to retaining the Debtors' sales and store management force. Commissions are calculated and awarded monthly. The Debtors estimate that there are approximately $4,000 in accrued but unpaid commissions as of the Petition Date.

92.    The Debtors also have several bonus plans programs to incentivize and encourage Employee sales and management performance. Store manager Employees are eligible to receive a series of field bonuses that include quarterly revenue bonuses based on the Wherehouse Store they manage meeting or exceeding certain quarterly revenue targets, annual expense control bonuses based on the Wherehouse Store they manage meeting certain expense budgets and annual store operating profit bonuses based on the Wherehouse Store they manage

meeting certain operating profit budgets. A portion of annual store operating profit bonuses is also allocated to support management Employees at each Wherehouse Store.

93. District manager Employees are eligible to receive quarterly revenue bonuses based on the number of Wherehouse Stores in their district that meet or exceed certain quarterly revenue targets, annual expense control bonuses based on the number of Wherehouse Stores in their district that meet certain expense budgets and annual operating profit bonuses based on the number of Wherehouse Stores in their district that meet certain operating profit budgets.

94. Regional manager employees are eligible to receive quarterly revenue bonuses based on the number of Wherehouse Stores in their region that meet or exceed certain quarterly revenue targets and annual operating profit bonuses based on the number of Wherehouse Stores in their region that meet certain operating profit budgets.

95. The quarterly revenue bonuses, annual expense control bonuses and annual store operating profit bonuses are awarded annually, and provide incentives for management to obtain financial targets and increase profitability. In order to receive any of these bonuses, eligible Employees must be employed by the Debtors on the date that the bonus is actually distributed, which is typically April 15th of each year. Accordingly, the Debtors do not believe that the quarterly revenue bonuses, annual expense control bonuses and annual store operating profit bonuses that would typically be paid on April 15, 2003 constitute prepetition Employee Obligations. However, out of an abundance of caution, the Debtors seek authority to pay in their discretion any portion of the quarterly revenue bonuses, annual expense control bonuses and annual store operating profit bonuses that may be deemed to be prepetition Employee Obligations. The Debtors estimate that any such quarterly revenue bonuses, annual

expense control bonuses and annual store operating profit bonuses shall not exceed the aggregate amount of approximately $200,000.

96.     In addition, the Debtors utilized a limited bonus program in December 2002 that permitted eligible Employees at certain Wherehouse Stores to receive monetary bonuses and gift cards based on the greatest increase in dollars per transaction against a baseline goal. The limited bonus program provides important incentives for Employees to increase sales and revenue. The Debtors estimate that there are approximately $3,200 in accrued but unpaid limited bonuses as of the Petition Date.

97.     The Debtors seek authority to continue their commission and bonus programs in the ordinary course and consequently pay all Employees' prepetition commissions and bonuses as well, which costs are relatively minimal compared with the size of the Debtors' estates and the damage to the Debtors' Chapter 11 Cases that would ensue if Employee morale were disrupted by the Debtors' failure to meet the commission and bonus components of their Employee Obligations.

**K.      Time Off Days**

98.     The Debtors also seek authority, but not direction, to permit Employees to use vacation time, personal time, sick leave and bereavement leave, whether accrued before or after the Petition Date (collectively, "Time Off Days"), in accordance with the Debtors' prepetition policies. Regular full-time Employees that work at least 32 hours per week generally accrue paid vacation time ("Vacation Time") based on their length of employment only on their employment anniversary date after continuous service, and there is no pro-ration of vacation time accrual.

99.     Vacation Time for qualifying regular full-time Employees accrue as
follows:  (i) Employees other than full-time sales associates continuously employed between one
and four years may accrue up to a maximum of 20 days of Vacation Time; (ii) Employees
continuously employed between five and fourteen years may accrue up to a maximum of 30 days
of Vacation Time and (iii) Employees continuously employed in excess of fifteen years may
accrue up to a maximum of 40 days of Vacation Time.  Full-time sales associates accrue 5 days
of Vacation Time for the first year of employment and thereafter their Vacation Time accrues
consistent with the preceding schedule.  Employees may carry over accrued but unused Vacation
Time hours from year to year; however, the carryover cannot exceed two times the respective
Employees' yearly accrual rate.  When Employees have reached the maximum number of
Vacation Time hours they may accrue, they will cease accruing Vacation Time hours until they
have used some of the Vacation Time hours.

100.    In addition, certain Employees are entitled to up to three days of paid
bereavement leave per calendar year for use in the event of a death of an immediate family
member.  Unused bereavement leave days will not carry forward from one calendar year to the
next calendar year for the Employees.  Upon termination, the Employees will not receive
payment for bereavement leave days not taken in that calendar year.

101.    Employees in the Debtors' corporate offices and distribution center are
also entitled to paid sick leave.  Employees in the Debtors' corporate offices and distribution
center except those that work mandatory ten hour shifts in the distribution center accrue 4 hours
of sick leave per month with an annual maximum of 48 hours of sick leave per calendar year.
Employees that work in the Debtors' distribution center and work mandatory ten hour shifts
accrue 5 hours of sick leave per month with an annual maximum of 60 hours of sick leave per

calendar year. Employees may carry over up to one year of unused sick leave days from one calendar year to the next calendar year.

### L. **Employee Benefits**

102. As part of the Debtors' Employee Obligations, the Debtors have also established a variety of benefit plans and programs (the "Employee Benefits") designed to assist their Employees and the Employees' eligible dependents in meeting certain financial burdens, including those that arise from illness, disability and death. The Debtors believe that all amounts and obligations related to Employee Benefits that were owed prior to the Petition Date have been paid in full except as otherwise noted herein. However, out of an abundance of caution, the Debtors seek authorization, but not direction, to pay or otherwise honor these Employee Benefits.

    (a)    <u>Employee Health Benefits</u>

103. The Debtors have established several health plans. Regular full-time Employees have the option of enrolling in a Blue Shield ("Blue Shield") Preferred Provider Plan (PPO) or a Health Maintenance Organization (HMO) administered by Blue Shield. Regular full-time Employees in Hawaii have the option of enrolling in a Kaiser Permanente ("Kaiser") HMO administered by Kaiser. The Debtors' executive management have the option of enrolling in a health plan administered by Execucare Medical ("Execucare") that provides medical, dental and vision care. Regular part-time Employees that are not eligible to participate in the Debtors' other health plans have the option of enrolling in a limited Starbridge PPO that provides medical, dental and vision care and is administered by The MEGA Life and Health Insurance Company under a group insurance contract.

104. Approximately 1,160 Employees participate in the fully insured Blue Shield plan, approximately 6 Employees participate in the fully insured Kaiser plan, approximately 16 Employees participate in the fully insured Execucare plan and approximately 57 Employees participate in the Starbridge plans. The Debtors pay monthly premiums of approximately $266,000 for the Blue Shield plan, approximately $1,400 for the Kaiser plan, approximately $8,000 for the Execucare plan and approximately $1,780 for the Starbridge plan.

105. Employees rely on the Debtors to provide continuing health care. Employee welfare, morale and expectations would be significantly harmed if the Debtors were to fail to pay any due amounts with respect to the health insurance plans. As noted above, the Debtors believe that all amounts and obligations related to the health insurance plans prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to the medical insurance benefits in the ordinary course of business.

106. In addition, the Debtors provide dental insurance to certain Employees through Aetna Dental, Execucare and Starbridge, and also provide vision care insurance through plans administered by Vision Service Plan, Execucare and Starbridge. Approximately 1,100 Employees participate in the Aetna Dental plan and approximately 1,200 Employees participate in the Vision Service Plan. The aggregate monthly costs related to Aetna Dental and Vision Service Plan insurance plans are approximately $23,130 for dental insurance and $5,520 for vision care insurance. The aggregate monthly cost of the Execucare and Starbridge insurance plans set forth above includes vision and dental care coverage. As in the case of medical insurance coverage, continuation of these insurance programs is important to maintain the welfare and morale of the Debtors' workforce. As noted above, the Debtors believe that all

amounts and obligations related to the dental and vision care insurance plans prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to dental and vision care insurance benefits in the ordinary course of business.

107.    Furthermore, and for similar reasons, the Debtors seek to continue to perform their obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (see 26 U.S.C. § 4980B) in respect to former employees. The Debtors self-administer COBRA, and former employees enrolling in COBRA pay an approximate aggregate amount of $9,990 per month to the Debtors for COBRA benefits. The Debtors in turn then pay this amount to the insurance carriers as monthly premiums for the continued health coverage of these former employees. As noted above, the Debtors believe that all amounts and obligations related to COBRA benefits prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to COBRA benefits in the ordinary course of business.

(b)     Employee Life and Other Insurance Benefits

108.    The Debtors offer Employees premium-base group life, accidental death and dismemberment ("AD&D"), disability and other insurance coverage. The Debtors pay Transamerica Life approximately $4,440 per month for basic life and AD&D insurance coverage premiums, and pay UNUM Life Insurance Co. approximately $2,900 in supplementary life insurance coverage premiums.

109.    The Debtors pay UNUM Life Insurance Co. approximately $5,250 per month in long term disability insurance coverage premiums, and pay Pacific Guardian Disability Insurance approximately $260 per quarter in short term disability coverage for Hawaii based

LA3:1029395.3

41

Employees. The Debtors have self-funded approximately $2,170 in the last month in short term disability coverage for non-Hawaii based Employees.

110. Employees can also elect to obtain supplemental insurance benefits through participating in a Cafeteria Plan administered by AFLAC that provides additional personal short term disability insurance coverage, personal accident expense plans, personal cancer protector plans and hospital plans. In order to participate in the Cafeteria Plan, Employees elect to have an annual sum voluntarily deducted from their payroll checks pro rata throughout the year to pay AFLAC for Cafeteria Plan insurance coverage premiums. The amount deducted from Employee payroll checks for Cafeteria Plan insurance coverage on a monthly basis is approximately $1,340.

111. As noted above, the Debtors believe that all amounts and obligations related to group life, AD&D, disability and other insurance coverage prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to group life, AD&D, disability and other insurance coverage in the ordinary course of business.

(c) Flexible Spending Benefits Program

112. Employees can elect to have an annual sum voluntarily deducted from their payroll checks pro rata throughout the year and placed in Flexible Spending Accounts in order to obtain reimbursements for medical expenses or dependent care expenses not covered by health insurance plans (the "Flexible Spending Benefits Program"). The deductions for medical expenses and dependent care expenses are collected in an AFLAC Flex One Unreimbursed Medical Account and an AFLAC Flex One Dependent Day Care Account.

113. Employees can seek reimbursement of their medical and dependent expenses during the enrollment year, up to an amount equal to the sum they elected to deduct for medical expenses for that enrollment year after the payroll deductions have occurred. Consequently, the Debtors do not have to pre-fund the AFLAC Flex One Unreimbursed Medical Account or the AFLAC Flex One Dependent Day Care Account. The Debtors administer and sponsor the Flexible Spending Benefits Program, and AFLAC processes reimbursement requests and distributes reimbursements at the direction of the Debtors. The total amount of medical and dependent care expense deductions elected by all of the Employees who are currently participating in the Flexible Spending Benefits Program for the current enrollment year is approximately $27,540. The Flexible Spending Benefits Program provides important benefits to Employees and is essential to maintain employee morale.

(d)     Retirement Benefits Plan

114. The Debtors offer certain Employees the opportunity to participate in a 401(k) Savings and Retirement Plan ("401(k) Plan") administered by T. Rowe Price ("Price"). Employees participating in this program may contribute up to 15% of their pre-tax salary toward their 401(k) account, but no more than the statutory cap, and the Debtors will make a matching contribution of 50% on the first 3% contributed by the Employee and a matching contribution of 25% on the next 2% contributed by the Employee. The Debtors believe that they are current on all 401(k) Plan matching contributions through at least December 2002, and that any 401(k) Plan matching contributions owing as of the Petition Date should be minimal. The Debtors pay approximately $14,300 to Price per quarter for administration expenses, and the Debtors also pay approximately $7,000 per year for auditors to review the 401(k) Plan.

115.     Further, the Debtors deduct from Employees' paychecks 401(k) Plan

contributions and loan payments. The Debtors issue their payroll checks through Pro Business

and forward withheld 401(k) Plan contributions and loan payments by wire transfer to Price

usually on pay day. Failure to timely forward these 401(k) deductions may be a violation of the

Employee Retirement Income Security Act of 1974, as amended, resulting in potentially personal

liability for the Debtor's officers for such deducted amounts. The Debtors estimate that there

may be approximately $410 in deducted but unremitted 401(k) Plan contributions and loan

payments as of the Petition Date.

116.     The Debtors believe that maintaining the 401(k) Plan is critical in

maintaining employee morale. Accordingly, the Debtors seek authority to continue in their

discretion the 401(k) Plan and to pay any 401(k) Plan matching contributions due but unpaid as

of the Petition Date.

**M.**     **Special Programs**

(a)     Employee Mental Health Assistance Programs

117.     The Debtors also offer Employees and their dependents with access to an

Employee Assistance Program managed by Managed Health Network that provides confidential

and professional counselors to address Employees' personal and professional concerns. The

Employee Assistance Program costs the Debtors approximately $8,040 per month. Like the

other special plans described above, this program provides important benefits to Employees and

improves employee morale at relatively modest costs. The Debtors request authority to pay any

costs related to, and to continue with such Employee Assistance Programs and related policies in

the ordinary course of business.

### N. Prepetition Amounts Withheld from Employee Paychecks and Related Deductions and Payments

118.    The Debtors deduct from their Employees' paychecks (as applicable) (i) payroll taxes and the Employees' portion of FICA and unemployment taxes; (ii) Employee contributions for health and disability related benefits, and flexible spending accounts; (iii) Employee contributions to 401(k) plans; (iv) legally ordered deductions such as wage garnishments, child support and tax levies and (v) miscellaneous other items (collectively, the "Employee Deductions"). The Debtors forward amounts equal to the Employee Deductions from their operating accounts to appropriate third-party recipients. Due to the commencement of these Chapter 11 cases, the Debtors anticipate that funds in the aggregate amount of approximately $4,770 were deducted from Employee paychecks but were not forwarded to the appropriate third-party recipients as of the Petition Date. The Debtors seek authority to forward the Employee Deductions to the appropriate parties.

### O. Reimbursable Expenses

119.    Eligible Employees may submit certain business related expenses to the Debtors for reimbursement. These expenses include relocation, car, hotel stay, meals, parking and other travel expenses and business related costs. As of the Petition Date, the Debtors estimate they owe Employees approximately $10,175 in reimbursements. The Debtors seek authority, but not direction, to pay these Employee Expenses and to continue to pay them post-petition in the ordinary course of business.

120.    As a result of the commencement of the Debtors' Chapter 11 cases, and in the absence of an order of the Court providing otherwise, the Debtors will be prohibited from paying or otherwise satisfying their prepetition obligations regarding Employee Obligations,

Employee Deductions and Employee Expenses, and the checks, wire transfers and direct deposit transfers issued in respect of the Employee Obligations, Employee Deductions and Employee Expenses will be dishonored. To maintain employee morale at this critical time for the Debtors, and to minimize the personal hardship the Employees would suffer if prepetition employee-related obligations are not paid or honored when due, the Debtors seek authority to honor in their discretion such obligations, including those described above.

121. The Debtors' petitions for relief under Chapter 11 of the Bankruptcy Code will very likely cause the Employees to question their future with the Debtors. While these Employees have demonstrated loyalty to the Debtors despite the uncertainty during the months prior to the commencement of these cases, their search for a sense of stability with regard to compensation and benefits may lead to an epidemic of Employee departures.

122. The Debtors' employees are essential to the success of the Debtors' business. The cost of replacing and then retraining Employees will outweigh the cost of honoring the prepetition employee related obligations. Thus, any significant number of Employee departures or deterioration in morale at this time will substantially and adversely impact the Debtors' businesses and result in immediate and irreparable harm to the creditors and estates. Consequently, it is critical that the Debtors continue in their ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date. If the checks issued and fund transfers requested in payment of the Employee Obligations, Employee Deductions and Employee Expenses are dishonored, or if such accrued obligations are not timely paid postpetition, the Debtors' employees will suffer extreme hardship and may be unable to pay their daily living expenses. Likewise, it would be inequitable to require the Debtors' employees

to bear personally the business expenses that were incurred on behalf of the Debtors with the expectation that they would be reimbursed.

123.    Authorizing, but not directing, the Debtors to pay the Employee Obligations, Employee Deductions and Employee Expenses in accordance with the Debtors' prepetition business practices is in the best interest of the Debtors, the Debtors' creditors and all parties in interest and will enable the Debtors to continue to operate their business in an economic, efficient manner without disruption. A significant deterioration in morale among Employees at this critical time undoubtedly would have a devastating impact on the Debtors, their customers, the value of their assets and business and their ability to reorganize.

124.    The Debtors submit that the amounts to be paid pursuant to the above referenced motion are de minimis in light of the importance and necessity of preserving the Employees' services and morale and the difficulties and losses the Debtors and their estates will suffer if Employees leave in significant numbers. Further, many of these obligations are not immediate but, rather, will be satisfied over an extended period of time. The Debtors also submit that there is ample justification for their belief that even the slightest delay in providing this relief to their Employees will hamper their operations and damage their estates and as a consequence the Debtors are anxious to reassure their Employees.

125.    The requested relief will also reduce the administrative burden that otherwise would be imposed in these cases. The Debtors believe that they do not have any Employees that are owed more than $4,650 in respect of the wages, salaries, commissions or other employee compensation that the Debtors seek to pay or otherwise honor earned within ninety days prior to the Petition Date.

126. With respect to the accrued and unpaid Employee Obligations, Employee Deductions and Employee Expenses, the Debtors request that, to the extent practicable, the applicable banks be directed to honor checks or fund transfer requests regardless of whether they were issued prior to or after the Petition Date. The Debtors have or will have on deposit sufficient funds in their disbursement accounts to satisfy all the Employee Obligations, Employee Deductions and Employee Expenses so that the banks will not be prejudiced by an order directing them to honor the Debtors' checks or fund transfer requests with respect to such amounts.

127. Based on the foregoing reasons, I submit that an order granting the relief requested in the above referenced motion is in the best interests of the Debtors, their estates, their creditors and any other parties in interest

**P.     Motion for Order Authorizing (i) Continuation of Workers' Compensation Program and Policies, All Other Insurance Policies and Agreements Relating Thereto, (ii) Continuation of Certain Premium Financing Arrangements Relating Thereto, and (iii) the Debtors to Honor Certain Obligations in Respect Thereof Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code**

128. In connection with the operation of the Debtors' business and management of their properties, the Debtors maintain various insurance policies through third-party insurance carriers. The Debtors believe that they have paid in full substantially all insurance policies as of the Petition Date, with the exception of two Workers' Compensation and Employer's Liability insurance policies numbered WC4551589 and WC1551590 (collectively, the "Insurance Policies") with American Home Assurance Company (the "Insurance Carrier"). The Insurance Policies provide coverage for workers' compensation claims employment-related claims. By the above referenced motion, the Debtors seek authority to maintain their Insurance Policies and

practices related thereto and seek further authority to pay all prepetition obligations under the Insurance Policies, including premiums and fees.

129. Under the laws of the various states in which the Debtors operate, they are required to maintain workers' compensation and employers' liability policies and to provide their employees with workers' compensation and employers' liability coverage for claims arising from or related to their employment with the Debtors.

130. The Debtors maintain their workers' compensation and employers' liability coverage through two Insurance Policies issued by the Insurance Carrier. Under the Insurance Policies, the Debtors pay an estimated annual aggregate premium of approximately $1,200,000 (inclusive of certain taxes and surcharges) regardless of the number or amount of claims made under the policies. Although the Debtors believe they are current in payment as of the Petition Date, the Debtors' aggregate liability with respect to the Insurance Policies may be adjusted based on changes in payroll obligations and other factors. Accordingly, it is difficult for the Debtors to determine the total amount of the actual final annual premium due under the Insurance Policies as of the Petition Date because the final annual premium is subject to adjustment. The premiums under the Insurance Policies are financed pursuant to the Premium Finance Agreements (as that term is defined herein) and, as of the Petition Date, the Debtors have determined that they may owe premiums under the Insurance Policies.

131. To maintain this insurance coverage, the Debtors often are required to prepay the full premiums for the applicable coverage period. With respect to some coverage, prepaying the full premiums imposes a significant financial burden on the Debtors. To lessen this burden, prior to the Petition Date, pursuant to a premium finance agreement (the "Premium Finance Agreement"), the Debtors financed the premiums for the Insurance Policies with AFCO

Credit Corporation ("AFCO"). The Premium Finance Agreement with AFCO was executed on August 5, 2002 and is effective from August 1, 2002 through July 31, 2003.

132.    Under the Premium Finance Agreement, AFCO pays the premiums due under the Insurance Policies, and the Debtors are then obligated to repay the amount financed under the Premium Finance Agreement through periodic installments over the term of the Premium Finance Agreement.

133.    Specifically, under the terms of the Premium Finance Agreement, AFCO paid a substantial portion of the full estimated aggregate annual premium of $1,200,000 to the Insurance Carrier for the Insurance Policies. The Debtors made a down payment to the insurance agent for the Insurance Carrier of approximately $120,000 and are obligated to repay AFCO the remaining premiums in nine monthly installments of $123,752.90 each at an annual interest rate of 7.452% percent. The first installment was paid to AFCO in September 2002 and the last installment is due in May 2003.

134.    The Premium Finance Agreement contains provisions that permit AFCO to cancel the Financed Insurance Policies if the Debtors default on their payment obligations under the Premium Finance Agreements. Upon such a cancellation, AFCO is entitled to collect any unearned premiums or other amounts payable under the Insurance Policies and to apply the refunds to reduce the Debtors' outstanding obligations under the Premium Finance Agreement.

135.    The Debtors must be permitted to maintain the Insurance Policies. If these policies were allowed to lapse, the Debtors would be exposed to substantial liability for any damages or loss resulting to persons and property of the Debtors and others. The guidelines of the Office of the United States Trustee also require the Debtors to maintain the Insurance Policies.

136.    In addition, it is essential to the continued operation of the Debtors' business and its efforts to reorganize that all undisputed workers' compensation claims are paid on a timely basis. The risk that eligible claimants will not receive payments with respect to job-related injuries may have a devastating effect on the financial well-being and morale of the Debtors' employees and their willingness to remain in the Debtors' employ. Departures by employees at this critical time may result in a severe disruption of the Debtors' business to the detriment of all parties in interest.

137.    Moreover, if postpetition installment payments under the Premium Finance Agreements are not paid as they come due, I am informed by counsel that the Premium Finance Companies could seek to terminate the Financed Insurance Policies. If the Premium Finance Companies succeed in such a request, the Debtors would be forced to seek replacement insurance coverage. Even if the Debtors were able to purchase replacement insurance coverage, it is doubtful that the Debtors would be able to do so on terms and conditions as favorable as those presently in place under the Financed Insurance Policies. Moreover, given the current circumstances, there is no assurance that the Debtors would be able to obtain replacement insurance quickly enough to prevent a lapse in coverage.

138.    The Insurance Policies for which premiums are financed under the Premium Finance Agreement provide the Debtors with essential insurance coverage. Any interruption in such coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Carrier under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Carrier under the Insurance Policies; (c) the possible loss of good-standing certification to

51

conduct business in states that require the Debtors to maintain certain types and levels of insurance coverage; (d) the possible inability to obtain similar types and levels of insurance coverage and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.

### Q. Motion for Order Authorizing the Debtors to Provide Adequate Assurance of Future Payment to Utility Companies Pursuant to Section 366(b) of the Bankruptcy Code

139. By this motion, the Debtors seek entry of an order that authorizes the Debtors to provide adequate assurance of future payment to utility companies.

140. In connection with the operation of their business and the management of their properties, the Debtors are provided with water, electricity, telephone and similar utility services (collectively, the "Utility Services") by approximately 300 different utility companies (collectively, the "Utility Companies"). Attached to the above reference motion as Exhibit A is a nonexclusive list of substantially all of the Utility Companies that were providing Utility Services to the Debtors as of the Petition Date.[9]

141. Prior to the Petition Date, the Utility Companies provided Utility Services to the Debtors at various locations, including the Debtors' retail stores located throughout the United States. Ordinarily, the Debtors pay each of the Utility Companies directly, upon receipt of a monthly invoice, for the Utility Service provided during the immediately preceding month. To the best of their knowledge, the Debtors have not had significant defaults or arrearages with

---

[9] Although the Debtors have exercised their best efforts to list all of the Utility Companies on Exhibit A to the above referenced motion, it is possible that certain Utility Companies may have been inadvertently omitted from Exhibit A. Accordingly, the Debtors request that any relief granted pursuant to the above referenced motion apply to any Utility Company that provides Utility Services to the Debtors, whether or not any such Utility Company is identified on Exhibit A to the above referenced motion.

respect to their undisputed invoices for Utility Services, other than payment interruptions that may be caused by the commencement of these Chapter 11 cases.

142.　If the Utility Companies are permitted to terminate Utility Services on the twenty-first day after the Petition Date, there will be severe disruptions in the Debtors' business affairs. Further, to avert such harm, the Debtors would be required to pay whatever amounts are demanded by the Utility Companies to avoid the cessation of necessary Utility Services.

143.　Prior to the Petition Date, the Debtors' average monthly cost of Utility Services was approximately $800,000. The Debtors submit that adequate assurance of payment to the Utility Companies is evident in these Chapter 11 cases in light of the Debtors' good payment history.

### Conclusion

144.　In order to preserve and maximize the value of their business and successfully reorganize, the Debtors' immediate goal is to engage in business as usual following the commencement of these Chapter 11 cases. I believe that, if the Court grants the relief requested in each First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtors' estates, their creditors and other parties in interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 21st day of January, 2003 at Torrance, California.

Mehdi Mahdavi
Vice President of Finance and Controller
Wherehouse Entertainment, Inc