## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **WHEREHOUSE ENTERTAINMENT, INC.,** | ) | |
| **a Delaware Corporation, et al¹.,** | ) | **Case No. 03-10224 (    )** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |

## MOTION PURSUANT TO 11 U.S.C. §§ 361, 362 AND 363, FED. R. BANKR. P. 4001(b) AND 9014, AND DEL. BANKR. LR 4001-2 FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS' USE OF CASH COLLATERAL, PROVIDING ADEQUATE PROTECTION THEREFOR AND SCHEDULING FINAL HEARING THEREON

Wherehouse Entertainment, Inc., and its direct and indirect wholly-owned subsidiaries Wherehouse Holding I Co., Inc., Wherehouse Holding II Co., Inc., Wherehouse Subsidiary I Co., Inc., Wherehouse Subsidiary II Co., Inc., Wherehouse Subsidiary III Co., Inc. and Wherehouse.com, Inc., each as a debtor and debtor in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") for entry of interim and final orders, pursuant to Bankruptcy Code (the "Bankruptcy Code") §§ 361, 362 and 363(c)(2), Fed. R. Bankr. P. 4001(b) and 9014, and Del. Bankr. LR 4001-2 authorizing the Debtors' use of Cash Collateral (as defined herein), granting adequate protection therefore and scheduling a final hearing thereon. In support of this Motion, the Debtors respectfully state as follows:

---

¹ The Debtors are the following entities: Wherehouse Entertainment, Inc., Wherehouse Holding I Co., Inc., Wherehouse Holding II Co., Inc., Wherehouse Subsidiary I Co., Inc., Wherehouse Subsidiary II Co., Inc., Wherehouse Subsidiary III Co., Inc. and Wherehouse com, Inc.

## Jurisdiction

1.　This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1134. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

2.　The basis for the relief requested herein is sections 361 and 363 of the Bankruptcy Code, and Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

3.　Wherehouse Entertainment, Inc., a Delaware corporation ("WEI"), and its direct and indirect wholly-owned subsidiaries Wherehouse Holding I Co., Inc., a Delaware corporation ("WEI Holding I"), Wherehouse Holding II Co., Inc., a Delaware corporation ("WEI Holding II"), Wherehouse Subsidiary I Co., Inc., a Delaware corporation ("WEI Subsidiary I"), Wherehouse Subsidiary II Co., Inc., a California corporation ("WEI Subsidiary II"), Wherehouse Subsidiary III Co., Inc., a Delaware corporation ("WEI Subsidiary III")[2] and Wherehouse.com, Inc., a California corporation each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on January 21, 2003 (the "Petition Date"). A motion for joint administration of the Debtors' bankruptcy cases pursuant to Federal Rule of Bankruptcy Procedure 1015(b) is pending before the Court. Pursuant to Bankruptcy Code Sections 1107(a) and 1108, the Debtors are operating their business and managing their affairs as debtors and debtors in possession. As of the date hereof, no trustee, examiner or committee has been appointed in any of these Chapter 11 cases.

---

[2] WEI Holding I, WEI Holding II, WEI Subsidiary I, WEI Subsidiary II, and WEI Subsidiary III are collectively referred to herein as the "Wherehouse Subsidiaries."

4.     WEI is a retailer of prerecorded music and other entertainment products. WEI's stores generally sell a broad array of entertainment products. WEI sells prerecorded music, videocassettes, DVDs, video games, personal electronics (including without limitation personal stereos, portable stereos, headphones and related merchandise), blank audiocassettes and videocassettes and accessories. WEI's total revenue for its most recent fiscal year, ended January 31, 2002, was $599.9 million. Of that, the percentage contributed by merchandise sales was 99.3%. WEI's other revenue source is the rental of prerecorded videocassettes, DVDs and other products.

5.     WEI is one of the largest retailers of prerecorded music and related media and electronics in the United States, both in terms of revenues and store locations. As of the Petition Date, WEI operated approximately 370 stores in 23 states (collectively, the "Wherehouse Stores"). All but 13 of WEI's stores operate under the names "The Wherehouse," "Wherehouse Music," or "Wherehouse Entertainment." The remaining stores operate under the names "Tu Musica," "Xchange," "Wherehouse Outlet" or "Odyssey." The Debtors also maintain executive offices in Torrance, California and a distribution center in Carson, California. The premises for WEI's stores, executive offices and distribution center are leased with the exception of one store that is owned by WEI.

6.     WEI's predecessor ("Old Wherehouse")[3] was formed in 1970. On August 2, 1995, Old Wherehouse and its parent company, WEI Holdings, Inc., a Delaware corporation ("Old Wherehouse Holdings"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware. During the following

---

[3] Until January 1997, Old Wherehouse was known as Wherehouse Entertainment, Inc. In connection with consummation of its chapter 11 plan of reorganization, Old Wherehouse changed its name to Wherehouse Dissolution Co. and sold substantially all its assets to WEI.

approximately 1½ years, they restructured their business operations and developed a plan of reorganization. That plan of reorganization (the "Old Wherehouse Plan") was confirmed by an order of the United States Bankruptcy Court for the District of Delaware entered on January 7, 1997. The Old Wherehouse Plan entailed the conversion of essentially all Old Wherehouse's institutional debt into equity in WEI.

7. WEI was formed as a Delaware corporation on November 15, 1996. On January 31, 1997, WEI acquired substantially all the assets of Old Wherehouse and Old Wherehouse Holdings pursuant to the Old Wherehouse Plan.

8. WEI acquired the Wherehouse Subsidiaries on October 26, 1998 in connection with a stock purchase from Viacom International, Inc. ("Viacom") As a result, WEI owns all of the capital stock of WEI Holding I and WEI Holding II. WEI Holding I in turn owns all of the capital stock of WEI Subsidiary I and WEI Subsidiary III as its sole significant assets. WEI Holding II in turn owns all of the capital stock of WEI Subsidiary II as its sole significant asset.

9. Prior to WEI's purchase of these companies in 1998, they had been operating music retail stores under the name "Blockbuster Music." Subsequent to the acquisition, WEI has conducted all operations at all of these stores under the "Wherehouse Music" name, and the Wherehouse Subsidiaries have been engaged only in holding the leaseholds for the former Blockbuster Music stores. Thus, WEI is the main operating company, employs essentially all the Debtors' employees, and owns all the inventory sold or rented in the stores. The Wherehouse Subsidiaries are real estate holding companies acting as the tenant under the leases for the former Blockbuster Music stores.

10. WEI currently employs approximately 5,300 employees. Approximately 1,600 of these employees are full-time employees, and approximately 3,700 are part-time employees or temporary employees. However, WEI's labor requirements vary based on seasonal business fluctuations, and a large number of additional store and distribution center employees may be added during the peak holiday season. WEI's corporate office staff consists of approximately 260 employees that are responsible for executive and general operational management, buying, merchandising, advertising, finance, accounting, human resources, legal, information systems and real estate management.

11. In the first several years after confirmation of Old Wherehouse's Plan, WEI prospered. However, during the recent past, WEI has been adversely affected by an industry-wide trend adversely affecting specialty music retailers. For example, according to Nielsen SoundScan, an industry analysis group, the music industry has seen total United States album sales for calendar year 2002 diminish by approximately 11%, and CD sales, which account for about 94% of the music industry market, diminish by approximately 9%.[4] For its fiscal year ended January 31, 2002, WEI's same store sales decreased approximately 6.4% and this trend has continued during the current fiscal year. Management attributes this largely to a general weakness in new music releases, CD "burning" and piracy of music over the Internet, and mass merchandisers and electronics retail chains selling new music and DVDs at or below cost. This trend has hit particularly hard at some of WEI's least profitable stores, particularly many of the former Blockbuster Music stores. Thus, during these bankruptcy cases, the Debtors intend to reject the leases for many of their unprofitable stores. Fortunately, WEI has a core

---

[4] Source: Los Angeles Times, January 3, 2003.

group of profitable stores around which it can reorganize and the Debtors intend to pursue such a reorganization as promptly as possible.

12.    WEI started this process prior to filing bankruptcy, shutting down some of its least profitable stores. But, obviously, a company's ability to downsize unprofitable operations is greatly enhanced by filing for bankruptcy protection and that is one of the main reasons the Debtors initiated these cases.

13.    In addition, the Debtors reached an impasse with Congress Financial Corporation (Western) ("Congress"), their secured working capital lender, which necessitated seeking bankruptcy protection. Over the last several months, the Debtors have engaged in extensive negotiations with Congress in an effort to reach a consensual resolution that allows the Debtors a chance to reorganize for the benefit of all their creditors. Unfortunately, those efforts have not yet resulted in an agreement with Congress and the Debtors were forced to commence these bankruptcy cases. The Debtors intend to continue to work with Congress over the following weeks in an effort to reach a consensual arrangement for use of cash collateral or debtor-in-possession financing. But in the interim, and as a safeguard in case those efforts do not bear fruit, the Debtors are compelled to seek to use cash collateral.

14.    The Debtors' total assets have a value significantly in excess of the Debtors' secured debt – assets of approximately $195 million (excluding goodwill and less reserves for shrink) as of the Petition Date as compared to secured debt of approximately $105 million.[5] As of the Petition Date, the Debtors have cash and cash equivalents of approximately $4.458 million, credit card receivables (net of reserves) of approximately $1.3 million, inventory held for sale (net of reserves) of approximately $151.3 million, inventory held for rental of $1.9

---

[5] Excluding the contingent reimbursement obligation on the Peterson Letter of Credit for unmatured interest on the Peterson Lawsuit, as discussed below.

million, furniture, fixtures and equipment of approximately $29.1 million (net of depreciation), notes receivable of approximately $2.887 million and prepaid expenses of approximately $4.2 million.

15.     The secured claims against these assets fall into two categories: loans and other obligations owed to Congress and debts owed to certain trade creditors.

16.     Congress has provided the Debtors with working capital loans pursuant to that certain Amended and Restated Loan and Security Agreement dated as of October 26, 1998 (the "Loan Agreement"). As of the Petition Date, these loans and other obligations totaled approximately $53.0 million — but as explained below, Congress's true exposure is approximately $40.35 million. Congress asserts a lien on essentially all of the Debtors' personal property.[6] The loans made by Congress are tied to very conservative advance rates that are based on the Debtors' most liquid assets and liquidation values to ensure that Congress is significantly oversecured under any conceivable scenario, and oversecured by a wide margin.

17.     For example, loans advanced by Congress prior to the Petition Date were based on a borrowing base formula that failed to give credit or value to any assets other than inventory held for sale, and then set advance rates using liquidation values for these assets.

18.     In doing so, Congress ignored significant portions of its asserted collateral, including inventory held for rental with an approximate value of $1.9 million, furniture, fixtures and equipment with an approximate value of $29.1 million, notes receivable of approximately $2.887 million and the value of the Wherehouse name and trademark.[7] Congress also added various reserves to reduce the liquidation value of its collateral for purposes of determining

---

[6] The Debtors reserve the right to challenge or avoid any of these asserted liens
[7] The trademark and name "Wherehouse" are well-known in the states in which WEI operates, particularly so in the western United States, where Wherehouse is a leading retailer

advances. During the last several months, Congress also has an availability "block" of $15.0 million – i.e., requiring that its loans be at least $15.0 million less than the borrowing base formula, which as noted above already had highly conservative conditions. In short, Congress has designed the Loan Agreement to make certain that it bears essentially no risk and that its loans are significantly oversecured.

19.     The total obligations owed by the Debtors to Congress were approximately $53 million as of the Petition Date. Of that total, approximately $41.6 million were for loans advanced to WEI. The remaining obligations are contingent reimbursement obligations that the Debtors will owe Congress if a letter of credit in the amount of $11.394 million is drawn (the "Peterson LC"). This letter of credit relates to the appeal of a personal injury judgment entered against WEI. On July 15, 2001, the Santa Clara County, California Superior Court entered a $7.6 million judgment against WEI in a personal injury lawsuit captioned Peterson, et al. v. Shapell Industries (the "Peterson Lawsuit"). While WEI was insured for this judgment, its insurer, Reliance Insurance Company, was ordered liquidated by the State of Pennsylvania on October 3, 2001. WEI intends to seek payment of this claim in Reliance's proceeding and understands that claims of policy holders, such as WEI, are given priority in this proceeding. Pending resolution of Reliance's proceeding, the California Insurance Guarantee Fund engaged counsel for WEI to prosecute an appeal of the judgment and to facilitate the posting of an appeal bond. The bonding company required WEI to post a letter of credit for the full amount of the judgment plus all post-judgment interest, at 10% per annum, that will accrue on the judgment if it remains outstanding for five years. The current amount of the judgment plus accrued post-judgment interest through the Petition Date is approximately $8.74 million. WEI believes that it has a strong case on appeal, but even if WEI is wrong and the plaintiff were

able to draw on the bond, presently WEI's maximum exposure is approximately $8.74 million. In other words, even in a worst case scenario, the maximum present draw under the Peterson Letter of Credit is approximately $2.654 million (representing unmatured interest) less than the amount of the letter of credit. And, correspondingly, Congress' present maximum exposure is $2.654 million less than the face amount of the letter of credit.

20. Last fall, Congress's risk was reduced even further. On September 16, 2002, Congress was provided an additional guarantee for $10.0 million of the Debtors' obligations to Congress by the Debtors' principal shareholder, Cerberus Partners, L.P. ("Cerberus"), through its affiliate Madeleine, LLC ("Madeleine"), which guarantee is secured with cash collateral posted with Congress. Madeleine further agreed that any claims it would have against the Debtors (by subrogation or otherwise) would be subordinated to the payment in full of the obligations owed by the Debtors to Congress. Thus, the beneficial interest in the last $10.0 million of Congress's lien is held by Madeleine – not Congress. Madeleine supports the Debtors' efforts to reorganize and does not object to the use of its cash collateral.

21. Accordingly, the true exposure to Congress is only approximately $40.35 million (the total outstanding obligations owed to Congress as of the Petition Date, $53 million, less the $10.0 million guarantee, less the $2.654 million of unmatured post-judgment interest in the Peterson Lawsuit).

22. The Debtors have also entered into Security Agreements dated as of January 31, 1997 and October 26, 1998 with certain of their major music and video suppliers, including BMG Music (also known as BMG Distribution), EMI Music Distribution, Polygram Group Distribution, Inc., Relativity Entertainment Distributors, Inc., Sony Music Entertainment, Inc., Universal Music and Video Distribution, Inc., Warner Home Video, Warner/Elektra/

Atlantic Corp., Alliance Entertainment Corp., Caroline Distribution and Baker & Taylor, Inc.,
(the "Secured Trade Creditors"). The Debtors' major suppliers have liens on all of the Debtors'
inventory (not just in the inventory supplied by the Secured Trade Creditors). This program was
developed in 1997 in recognition of the fact that there is significant equity in the Debtors'
inventory after satisfaction of Congress's lien. The Secured Trade Creditors entered into an
Intercreditor and Collateral Agency Agreement dated as of January 31, 1997 pursuant to which
they appointed Bank of New York[8] to act as their collateral agent, and in so doing agreed to act
in a coordinated joint manner with respect to their liens at the direction of holders of 66 2/3% of
the Secured Trade debt. The Secured Trade Creditors also entered into Intercreditor and
Subordination Agreements dated as of January 31, 1997 and October 26, 1998 with Congress
(the "Intercreditor and Subordination Agreements") in which they agreed that their liens on
inventory would be junior to Congress's lien. The Secured Trade Creditors are owed
approximately $55.7 million as of the Petition Date. The equity in the Debtors' inventory
available over and above the debt owed to Congress[9] is approximately $143 million –
approximately $ 87 million more than the Debtors owe to the Secured Trade Creditors. In short,
the Secured Trade Creditors are also oversecured.

23. The Debtors have been engaged in forthright dialogue with the Secured
Trade Creditors, including an unofficial committee of music vendors (the "Trade Committee")
formed prior to the Petition Date. Members of the Trade Committee hold approximately 90% of
the Secured Trade Debt. The Debtors intend to work very closely with their major trade
creditors in developing a viable business plan and reorganization after disposing of the

---

[8] Bank of New York succeeded US Trust, which was the original collateral agent for the Secured Trade
Creditors.
[9] Including the $10 million guaranteed by Madeleine.

unprofitable stores that have caused the Debtors' current financial problems. The Debtors have been advised that Secured Trade Creditors holding significantly more than the requisite debt under the trade lien agreements[10] will support the Debtors' efforts to reorganize and consent to the use of their cash collateral as provided in this Motion. In any event, as set forth below, the Secured Trade Creditors – like Congress – will be adequately protected.

### Relief Requested

24. Over the last several months, the Debtors have engaged in extensive negotiations with Congress in an effort to reach a consensual resolution that allows the Debtors a chance to reorganize for the benefit of all their creditors. Unfortunately, to date those efforts were unsuccessful and the Debtors were forced to file this Motion to permit the use of cash that is essential for their operations. By this Motion, the Debtors seek, _inter alia_, entry of interim and final orders pursuant to 11 U.S.C. §§ 361, 362 and 363 and Bankruptcy Rules 4001(b) and 9014, (i) authorizing the Debtors' use of cash collateral in which Congress and the Secured Trade Creditors have or assert liens or security interests,[11] including without limitation all cash, negotiable instruments, documents of title, securities, deposit accounts, all proceeds of accounts receivable and inventory, and all other cash equivalents and cash collateral as such term is defined in Bankruptcy Code Section 363(a) (collectively, the "Cash Collateral") pursuant to the provisions of Bankruptcy Code Section 363(c) of the Bankruptcy Code and (ii) providing Congress and the Secured Trade Creditors with adequate protection for any diminution in the value of any valid and unavoidable liens and security interests they may possess in the Cash

---

[10] Under the trade lien agreements, Bank of New York is to take direction from the Secured Trade Creditors holding at least 66 2/3% of all Secured Trade debt.

[11] As noted above, the Debtors reserve the right to challenge or seek to avoid any of these asserted liens or security interests. Nothing herein shall constitute an admission by the Debtors that any such liens are valid or unavoidable.

Collateral arising from the Debtors' use of such Cash Collateral by granting Congress and the Secured Trade Creditors replacement liens on and security interests in the postpetition assets of the Debtors, with such replacement liens to have the same validity, priority and extent as Congress's and the Secured Trade Creditors' prepetition liens[12] and, to the extent such replacement liens prove inadequate, an allowed super administrative expense priority claims against the Debtors' estates pursuant to Bankruptcy Code Section 507(b)[13], and providing that such use of Cash Collateral will be limited to 14 weeks (i.e., through the week ending April 26, 2003), and subject to the budget attached hereto as Exhibit A (the "Budget"). Of course, the Debtors reserve the right to seek subsequent use of Cash Collateral.

## Basis for Relief

25. As of the Petition Date, the Debtors collectively held cash in their operating accounts aggregating approximately $4.458 million, subject to outstanding and unpresented checks. The Debtors project that they will realize significant additional cash in the future from their operations. Virtually all of the Debtors' assets, including cash and cash proceeds, are encumbered under the Loan Agreement.

26. The Debtors have an urgent and immediate need for cash to continue to operate their business and meet actual and necessary expenses, and their continued use of Cash Collateral is the only way to continue their operations. The Debtors' proposed use of Cash Collateral pursuant to the Budget to meet actual and necessary expenses is appropriate under the circumstances for several reasons. The Debtors seek to use Cash Collateral only in the amounts

---

[12] Such replacement liens shall not encumber any avoidance actions and other claims for relief of the Debtors arising under Bankruptcy Code Sections 506(c), 510, 544, 545, 547, 548, 549, 550, 551 and 553 or any proceeds thereof.

[13] Such superpriority claims shall be subject and subordinate to the compensation and expense reimbursement (excluding professional fees) allowed to any trustee hereafter appointed in these chapter 11 cases and the fees payable to the Clerk of the Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a)

set forth in the Budget, with total expenditures for a period not to exceed the amounts budgeted for that period, plus any amounts budgeted for prior periods that are not in fact expended.[14]

27.    The expenses the Debtors seek authority to pay are for certain critical pre-petition obligations and continued operations post-petition. Without immediate and ongoing access to the cash in the Debtors' operating accounts and the cash to be collected after the Petition Date from encumbered assets, the Debtors cannot pay current and ongoing operating expenses, including post-petition wages and salaries, rent, utilities and other essential services, and cannot purchase the inventory that is the lifeblood of their business. Unless these expenditures are made, the Debtors will be forced to cease operations and their substantial going concern value will be destroyed. Consequently, the Debtors, their estates and unsecured creditors will suffer irreparable harm if the Debtors are not able to use Cash Collateral as set forth in the Budget. Not allowing the Debtors to use Cash Collateral as sought herein would also kill any prospects for a successful reorganization.

28.    The entry of an interim order authorizing the Debtors to use Cash Collateral (the "Interim Cash Collateral Order") substantially in the form attached hereto as Exhibit B will help maintain customer, employee, and supplier confidence in the Debtors' ability to continue operations and pay for goods sold and delivered (including the extension of credit terms for the payments of goods and services). The Debtors' use of Cash Collateral will also be limited to amounts set forth in the Budget, providing additional safeguards for all creditors of the Debtors' estates. Accordingly, the Debtors request that the Court authorize, on an interim and final basis, the Debtors' use of Cash Collateral and approve the provisions regarding adequate

---

[14] The Debtors propose that expenditures be allowed to exceed the budgeted amount for a period by (i) any amounts budgeted in prior periods but not spent and (ii) 15% for an individual line item.

protection of Congress's interests and, thereafter, a final order authorizing the Debtors to use Cash Collateral for the period set forth in the Budget (the "Final Cash Collateral Order").

29. The objective of the Debtors' reorganization is to preserve and maximize the value of the estates and to continue business operations. The Debtors submit that Congress and the Secured Trade Creditors are adequately protected by the Debtors' going concern value and the equity cushion that exists in their asserted collateral. In order to ensure that Congress's and the Secured Trade Creditors' interest in their asserted Cash Collateral is adequately protected, the Debtors will provide them with replacement liens[15] in all postpetition cash, inventory and accounts receivable of a value equal to the amount of Cash Collateral used by the Debtors and to the extent that Congress or the Secured Trade Creditors hold a properly perfect and nonavoidable prepetition lien in the expended Cash Collateral. In addition, Congress and the Secured Trade Creditors will be granted an allowed super administrative expense claim in accordance with Bankruptcy Code Section 507(b) in the unlikely event and to the extent the replacement liens fail to provide them with adequate protection. Therefore, if and to the extent Congress's and the Secured Trade Creditors' equity cushions diminish as a result of the Debtors' use of Cash Collateral, they will be more than adequately protected against such diminution by the replacement liens and superpriority claims as set forth herein.

### Applicable Authority

30. Pursuant to Bankruptcy Code Section 363(c)(2)(B), a debtor-in-possession may use cash collateral with court approval after notice and a hearing. 11 U.S.C. § 363(c)(2)(B). Bankruptcy Code Section 363(e) provides that, upon request of an entity that has an interest in property to be used by a debtor, the Court "shall prohibit or condition such use . . . as is

---

[15] Such replacement liens will have the same extent, validity and priority as the secured creditors' liens and security interests in prepetition collateral.

necessary to provide adequate protection of such interest."[16] 11 U.S.C. § 363(e). Here, the Court should approve the Debtors' proposed use of Cash Collateral because Congress's and the Secured Trade Creditors' interests in Cash Collateral will be more than adequately protected during the Debtors' continued business operations.

31.     Adequate protection can be provided by a number of different methods. See e.g. 11 U.S.C. § 361. Pursuant to Bankruptcy Code Section 361, adequate protection may be provided by (1) making "a cash payment or periodic cash payments to [an] entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title . . . results in a decrease in the value of [the] entity's interest in such property," (2) "providing to [an] entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of [the] entity's interest in such property" or (3) "granting such other relief . . . as will result in the realization by [an] entity of the indubitable equivalent of [the] entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3)

32.     What constitutes adequate protection is determined on a case-by-case basis. See MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). However, regardless of how adequate protection is provided, the focus of the requirement is to protect a secured creditor from diminution in value of its interest in the collateral during the period of use by the debtor. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridge v. Production Credit Ass'n & Fed. Land Bank, 104 B.R. 824, 827-28 (E.D. Mich. 1989); In re Beker Indus. Corp., 58 B.R.

---

[16] The debtor bears the burden of proof on the issue of adequate protection of an entity's interest in cash collateral, while "the entity asserting an interest in property has the burden or proof on the issue of the validity, priority or extent of such interest." 11 U.S.C. § 363(o)(2).

725, 736 (Bankr. S.D.N.Y. 1986); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

33.     In other words, adequate protection is necessary only to the extent the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."[17] 11 U.S.C. §§ 361, 363(e); see United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370-73 (1988) (the "interest in property" entitled to protection is "the value of the collateral" securing the claim). As the court in In re Megan-Racine Assoc., Inc., 202 B.R. 660 (Bankr. N.D.N.Y. 1996) noted:

> Adequate protection . . . is intended to compensate a creditor for any decrease in the value of its security interest in collateral during the pendency of the debtor's reorganization that is due to the imposition of the stay or is traceable to the use of such property.

Id. at 663.

34.     Here, Congress and the Secured Trade Creditors are only entitled to protection against the decline in value of their interest in prepetition collateral by the Debtors' use of Cash Collateral. As discussed herein, granting them replacement liens to the extent there is any diminution in the value of their prepetition collateral by the Debtors' continued use of Cash Collateral, the equity cushion that exists in excess of the outstanding secured debt and the preservation of the Debtors' going concern value provides sufficient adequate protection within the meaning of Bankruptcy Code Sections 361 and 363(e).

---

[17] Thus, if a secured creditor's interest in the value of its collateral is not diminished by a debtor's use, sale or lease of the collateral, the secured creditor's interest in the collateral is adequately protected.

**A.**   **Congress and the Secured Trade Creditors Will be Adequately Protected by Replacement Liens on Postpetition Assets to the Extent Their Prepetition Collateral is Diminished by the Debtors' Use of Cash Collateral**

35.     As noted above, Bankruptcy Code Section 361(2) expressly provides that the granting of a replacement lien constitutes a means of providing adequate protection. 11 U.S.C. § 361(2). Here, granting Congress and the Secured Trade Creditors with replacement liens on postpetition collateral to the extent their prepetition collateral is diminished by the Debtors' use of Cash Collateral will provide them with sufficient adequate protection. See e.g. O'Connor, 808 F.2d 1393; In re Coody, 59 B.R. 164, 167 (Bankr. M.D. Ga. 1986); In re Dixie-Shamrock Oil & Gas, Inc., 39 B.R. 115, 118 (Bankr. M.D. Tenn. 1984).

**B.**   **Congress and the Secured Trade Creditors Will Be Adequately Protected by a Significant Equity Cushion in Their Collateral**

36.     The interests of Congress and the Secured Trade Creditors in their collateral will also be adequately protected by a significant equity cushion. The existence of value in collateral in excess of the amount of the secured claim (i.e., an equity cushion) provides the classic form of protection for secured debt and can itself provide sufficient adequate protection. See Pistole v. Mellor (In re Mellor), 734 F.2d 1396; In re Llewellyn, 27 B.R. 481 (Bankr. M.D. Pa. 1983); Dixie-Shamrock Oil & Gas, Inc., 39 B.R. at 117-118 (holding that equity cushion of $500,000 on $7.1 million debt provided adequate protection); In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980 (holding that 10% equity cushion provided adequate protection); In re Elmira Litho, Inc., 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994); In re McKillips, 81 B.R. 454, 458 (N.D. Ill. 1987); In re Phoenix Steel Corp., 39 B.R. 218, 224 (D. Del. 1984).

37.     In determining the existence and extent of an equity cushion, most courts value the collateral on a going concern or fair market value basis. See e.g. In re Winthrop Old

Farm Nurseries, Inc., 50 F.3d 72, 74-75 (1st Cir. 1995) (valuing creditor's interest in property to be retained by debtor at its "going-concern or fair market value with no deduction for hypothetical costs of sale"); In re McClurkin, 31 F.3d 401, 405 (6th Cir. 1994); Mellor, 734 F.2d at 1401; In re Automatic Voting Machines Corp., 26 B.R. 970 (Bankr. W.D.N.Y. 1983); In re QPL Components, Inc., 20 B.R. 342 (Bankr. E.D.N.Y. 1982).

      38.    It is particularly appropriate for a bankruptcy court to value the collateral on a going concern or fair market value basis early in a bankruptcy case so the debtor is provided an opportunity to reorganize, and any doubt should be resolved in favor of facilitating the debtor's attempt at reorganization. In re Hoffman, 51 B.R. 42, 47 (Bankr. W.D. Ark. 1985); In re A&B Heating & Air Conditioning, Inc., 48 B.R. 493, 496 (Bankr. N.D. Fla. 1985); In re Heatron, Inc., 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). As the Heatron court stated in granting the debtor's motion to use cash collateral:

> The policy of the Code, as with the predecessor statutes, is to encourage reorganization if there is a reasonable possibility of success.... At the beginning of the reorganization process, the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization, where the evidence is conflicting.

Id. at 496.

      39.    The court in O'Connor, 808 F.2d 1393 summarized the principle as follows:

> Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estates, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor ... are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral should be permitted during the early stages of administration. The first effort of the court must be to insure the value of the collateral will be preserved.

Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

Id. at 1397-98; see also In re Sun Valley Newspapers, Inc., 171 B.R. 71, 75 (Bankr. 9th Cir. 1994) (the debtor should be given substantial latitude during the initial phases of the case if it is plausible that it can propose a confirmable plan).

40.    Here, the entire structure of Congress's loan was designed to ensure that it has a very large equity cushion. Congress asserts secured claims as of the Petition Date of approximately $40 million, excluding the $10.0 million guaranteed debt where Madeleine bears the economic risk and unmatured post-judgment interest on the Peterson Lawsuit supported by the Peterson Letter of Credit. In contrast, Congress's collateral has a value in excess of $194 million. In other words, Congress enjoys an equity cushion of approximately 485%. Similarly, the Secured Trade Creditors have an equity cushion of approximately $144 million, or 258%. As set forth in the projections attached hereto, the equity cushions enjoyed by Congress and the Secured Trade Creditors will continue at very high levels, even during the traditionally slow first and second fiscal quarters.[18] These significant equity cushions will provide more than adequate protection. See e.g. In re Monnier, 755 F.2d 1336, 1340 (8th Cir. 1985) (25% equity cushion was adequate); In re Industrial Valley Refrigerating and Air Conditioning Supplies, 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) (equity cushion of approximately 50% was adequate); McKillips, 81 B.R. at 458 (equity cushion of 20% or more almost always constitutes adequate protection); In re Boulders on the River, Inc., 164 B.R. 99, 104 (9th Cir. BAP 1994) (11.45% equity cushion was

---

[18] As the Court is undoubtedly aware, even the most profitable specialty retailers typically incur losses during the first of the year, with profits and operating income concentrated in the fourth quarter

adequate); In re McGowen, 6 B.R. 241 (Bankr. E.D. Pa. 1980) (10% equity cushion was adequate).

## C. The Use of Cash Collateral Will Maintain and Preserve the Debtors' Going Concern Value and Benefit Congress, the Secured Trade Creditors and Other Parties in Interest

41. The continuation of the Debtors as a going concern will also preserve the value of the Debtors' assets. As described in the Declaration of Christopher Noble, the value of cash, accounts receivable and inventory and the proceeds thereof will be preserved through the continuation of the Debtors' business operations.

42. The continued operation of the Debtors' business will allow the Debtors to maintain Cash Collateral in which Congress and the Secured Trade Creditors assert an interest, preserve the Debtors' going concern value and foster the Debtors' ability to propose and confirm a plan of reorganization. It is well established that, where possible, a bankruptcy court should resolve issues in favor of reorganization. See In re Hoffman, 51 B.R. 42, 47 (Bankr. W.D. Ark. 1985); In re A&B Heating and Air Conditioning, Inc., 48 B.R. 401, 403-04 (Bankr. M.D. Fla. 1985); In re Heatron, Inc., 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). For example, in Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d 1017 (11th Cir. 1984) the court noted:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

Id. at 1019.

43.    Courts frequently allow a debtor to use cash collateral where such use would enhance or preserve the debtor's going concern value and ability to reorganize. See e.g. Federal Nat. Mort. V. Dacon Bolingbrook Assoc., 153 B.R. 204, 214 (N.D. Ill. 1993); In re Constable Plaza Assoc., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) Stein v. United States Fanners Home Admin. (In re Stein), 19 B.R. 458 (Bankr. E.D. Pa. 1982); In re Pine Lake Village Apartment Co., 16 B.R. 750 (Bankr. S.D.N.Y. 1982). For example, in Stein the court allowed the debtor to use cash collateral where the secured party was undersecured, finding that such cash collateral use was necessary to the debtor's continued operations and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]." Stein, 19 B.R. at 460.

44.    The Debtors' use of Cash Collateral will ensure that the going concern value of their assets is preserved and maintained, and such value is substantially greater than the value that would be realized from a liquidation of those assets if the Debtors were forced to cease operations. Without access to Cash Collateral, the Debtors will be forced to terminate their operations and commence a liquidation that would severely reduce the value of the estates. In contrast, the use of Cash Collateral will permit the continuation of the Debtors' business operations and preserve the value of all collateral in which Congress and the Secured Trade Creditors assert an interest. Thus, the Debtors' continued business operations will enhance the value of Congress's and the Secured Trade Creditors' interests in their collateral, and will provide them with adequate protection of their interest in Cash Collateral. See e.g. Coody, 59 B.R. at 176; In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is

whether that interest, whatever it is, is being unjustifiably jeopardized."); In re Grant Broadcasting, 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 819 (E.D. Pa. 1987).

## Notice and Hearing

45.     Pursuant to Bankruptcy Rule 4001(b), a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fifteen days after the service of such motion. Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on such motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the debtor's estate. See Bankruptcy Rule 4001(b)(2).

46.     The Debtors request that the Court (a) conduct an expedited hearing with respect to the Motion (as described herein) and (b) schedule a final hearing on this Motion ("Final Hearing") and establish notice and objection procedures in respect thereof at the earliest possible date in accordance with Bankruptcy Rule 4001(b) but no later than forty five days from the entry of the Interim Cash Collateral Order.

47.     The Debtors have provided notice of the Motion, via telecopy or by hand delivery, to (a) counsel to Congress, (b) counsel to the Trade Committee, (c) Bank of New York, as collateral agent for the Secured Trade Creditors, (d) the Office of the United States Trustee and (e) the 20 largest general unsecured creditors of each of the Debtors.

48.     Following entry of the Interim Cash Collateral Order, the Debtors shall serve by United States mail, first class postage-prepaid, copies of the Motion, the Interim Cash Collateral Order and a notice of hearing to consider entry of the Final Cash Collateral Order ("Final Hearing Notice") to be held in accordance with Del. Bankr. LR 4001-2(c), on (a) counsel to any official Committee or, barring timely appointment of such Committee, and the entities set

forth on the list of the twenty (20) largest unsecured creditors of each of the Debtors; (b) the

Office of the United States Trustee; (c) counsel to Congress, (d) counsel to the Trade Committee,

(e) Bank of New York and (f) all parties who have timely filed requests for notice under

Bankruptcy Rule 2002.

49.     The Debtors respectfully submit that, except as described above, no other

or further notice need be provided.

### No Prior Request

50.     No previous motion for the relief sought herein has been made to this or

any other court.

### Notice

51.     No trustee, examiner or creditors' committee has been appointed in these

chapter 11 cases. Notice of this Motion has been given to (a) the Office of the United States

Trustee, (b) counsel to Congress, (c) counsel to the Trade Committee, (d) Bank of New York,

and (e) the 20 largest unsecured creditors of each of the Debtors. As this Motion is seeking first

day relief, notice of this Motion and any order entered hereon will be served as required by Local

Rule 9013-2(d). In light of the nature of the relief requested herein, the Debtors submit that no

other or further notice is required.

52.     The Debtors submit that this Motion does not present any novel issues of

law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and

Procedure of the United States District Court for the District of Delaware (the "Local District

Court Rules"), incorporated by reference into Del. Bankr. LR 1001-1(b), the Debtors respectfully

request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local

District Court Rules.

WHEREFORE, the Debtors respectfully request (i) immediate entry of the Interim Cash Collateral Order (substantially in the form submitted herewith) and the scheduling of the date for the Final Hearing, (ii) at the Final Hearing, entry of the Final Cash Collateral Order and (iii) the granting of such other and further relief as is just and proper.

Dated: January 21, 2003
Wilmington, Delaware

Respectfully submitted,

_Paul A. H_

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Marc T. Foster (No. 4256)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

- and -

Ben H. Logan
Suzzanne Uhland
Vicki A. Nash
Brian M. Metcalf
O'MELVENY & MYERS LLP
400 South Hope St.
Los Angeles, California 90071
(213) 430-6000

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION